Herman B. **MEISELMAN** and Claire Meiselman, General Realty & Management, Inc., Delux Theatres, Inc., Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 8463.

United States Court of Appeals Fourth Circuit.

Argued Jan. 9, 1962.

Decided March 14, 1962.

F. T. Miller, Jr., Charlotte, N. C. (F. A. McCleneghan, Charlotte, N. C., on brief), for petitioners.

Alan D. Pekelner, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and Meyer Rothwacks, Attorneys, Department of Justice, on brief), for respondent.

Before SOBELOFF, Chief Judge, and BRYAN and BELL, Circuit Judges.

J. SPENCER BELL, Circuit Judge.

This is an appeal from decisions of the Tax Court of the United States sustaining deficiency determinations by the Commissioner of Internal Revenue under the Internal Revenue Code of 1939. The deficiencies were based upon the assertion by the Commissioner that amounts received by the taxpayers upon the disposition of certain theaters in the year 1953 represented rentals pursuant to a lease arrangement. The taxpayers had treated the transaction as a sale of capital assets held for more than six months.

While holding that the payments in question were to be taxed to the Appellants herein as rents, the Tax Court nevertheless sustained the taxpayers' contentions that certain notes they received as evidence of the right to receive deferred payments were without fair market value and were not includible in income in the year of their receipt. The Commissioner did not oppose this finding by the Tax Court here. The parties have contended before us that the only question involved in this appeal is whether this transaction was a sale or lease.

The Petitioners, Herman B. Meiselman (hereinafter caller Meiselman) and Claire Meiselman, are husband and wife. During the taxable year 1953, they filed a joint income tax return with the District Director of Internal Revenue, Greensboro, North Carolina. They, individually, did business in the partnership name of H. B. Meiselman Theaters.

The corporate petitioners * are North Carolina corporations. For the calendar year 1953, each filed a corporate income tax return with the District Director in Greensboro.

The petitioners are, and have for several years, engaged in the operation of motion picture theatres. The corporate petitioners are controlled by the individual petitioners, who together with other members of their family own all of the outstanding stock of each of these corporations.

In July 1953 the petitioners agreed to sell as a "package deal" seven separate theatres to Stellings-Gossett Theatres, Inc., as "key jobs" or going businesses. Pursuant to this agreement, Stellings-Gossett had its attorney draft a contract dated July 25, 1953, from forms in its office, which contract purported to be a lease of the realty incident to each of the theatres and a sale of the equipment then in four of the theatres. Stellings testified, and his testimony is undisputed, that Meiselman had no part in the preparation of the contract. By contract dated July 29, 1953, the consideration was reallocated among the several theatres.[1]

The transferor was obligated promptly to repair or restore any damage done to any theatre by fire and to replace such theatre if it should be destroyed. The transferor also agreed to take out adequate insurance against fire and other elements on the buildings and equipment. The insurance was to be payable to the parties as their interests should appear. Liability insurance was to be provided by the transferee.

The transferee agreed to maintain the theatres and equipment in reasonably good condition except for depreciation and normal wear and tear. The transferor was given an option to be effective at the end of each term to repurchase the equipment for One Hundred Dollars ($100.00). The total amount to be paid for the sale of the going business was

---

* General Realty and Management, Inc., Brash Realty, Inc., and Delux Theaters, Inc.

1. Typical of those parts of the contract pertinent to the sale of the equipment in four of the theatres with the changes of July 29th inserted is the following paragraph:

"This lease as to the Strand Theatre in Rockingham shall be for a term of ten (10) years from August 1, 1953. The Tenant agrees to pay a monthly rental in advance of One Hundred Fifty ($150.-00) Dollars. In addition to this the Tenant agrees to pay immediately the sum of Thirty-Two Thousand Five Hundred ($32,500.00) Dollars for the equipment and apparatus used in connection with the said threatre." [As amended by contract of July 29th: "The price for the equipment and apparatus used in connection with the Strand Threatre in Rockingham shall be and hereby is agreed to be $17,500.00. Of this amount $5,000.-00 shall be paid by the tenant immediately. The parties of the first part acknowledge the receipt of this cash payment. The remaining $12,500.00 shall be paid in twenty equal quarterly installments beginning January 10, 1954 and on the 10th day of each April, July, October and January thereafter until the same shall have been completely paid, except that on the demand of the landlords, two payments shall be made on January 10, 1954."]

$182,500.00. Of this amount, $109,-000.00 was to be paid in 1953, and the balance was evidenced by non-interest bearing notes. These notes, at the time of their issuance to Meiselman had no fair market value. The depreciated basis of this equipment in Meiselman's hands at the time of the sale was $50,-441.95. Its estimated value in these operating theatres was $83,000–$98,000.

When the returns of the petitioners were filed the Commissioner assessed deficiencies against petitioners claiming that that part of the transaction dealing with the transfer of the equipment was in fact a lease and not a sale, and therefore the proceeds of the contract allocable to the equipment were includible in ordinary income as "rentals received" and were not subject to treatment as capital gains. The Commissioner further claimed that the bonds evidencing the unpaid balance of $73,500.00 were taxable as income in the year in which they were received.

■ The question, then, is whether this transaction, aside from its bearing on the realty, is to be considered a sale or a lease. It is conceded by both the parties and agreed by the Court below that this question is to be resolved by looking to the *substance* of the transaction. This is the correct law. Hamme v. Commissioner, 209 F.2d 29 (4 Cir. 1953); Cert. denied, 347 U.S. 954, 74 S. Ct. 679, 98 L.Ed. 1099 (1954).

■ We start with the premise that the parties are free as far as the law is concerned, either to sell or lease. They must accept the tax consequences properly attributable to the transaction which in fact took place. We are not to categorize the transaction in such a way as to milk the most taxes therefrom, nor are we to allow ourselves to be deceived by any effort to disguise its true nature in order to avoid a proper consequence. The label put on the transaction by the parties is not conclusive of its nature. This is to be determined by looking at all of the facts and circumstances surrounding the transaction to determine its actu-

al legal effect. Cf. Western Contracting Corp. v. Commissioner, 271 F.2d 694 (8 Cir. 1959). If these facts show the real intent of the parties to have been to complete a "sale" then the transaction should be so categorized for tax purposes.

We think that it is of major significance that the parties first reached an oral agreement to transfer the entire group of theatres as a "package deal" for an over-all price and then delegated to Stellings' attorney the job of drawing up the written contract.

Both Stellings and Meiselman testified in the proceedings below that they intended a sale of each of the theatres as a going concern when they reached their oral agreement. Stellings said he bought "turnkey jobs", that is, theatres in operation. Meiselman said that his principal motive was to cut down the extent of his operations because his doctor had warned him about a heart condition and because his son, who assisted in the business, was being called into the Army. This much of the evidence tends to show that the parties thought in terms of a *sale* of these theatres as going businesses. There is no direct evidence in the record to contradict this intent, nor do we think that the Tax Court was justified in superimposing its own hypothetical "intentions" based on an elaborate analysis of each of the separate paragraphs of the written contract.

It is not disputed that the real property involved was either leased or subleased to the transferees. The Tax Court found four provisions in the contract dealing with the transfer of the equipment which it said indicated that this also was leased.

First of all, the lease of the realty is not inconsistent in any way with a sale of the business operated thereon. Further, it is not inconsistent with normal business practice for the owner of a going business, upon selling this business *as a going concern* to retain the realty upon which it is located and lease it to *the business*. In the light of these factors we do not think that the lease of the realty in this case in any way negates a sale of these theatres as going concerns.

The fact that the realty was leased rather than sold does, however, have a relevance here, which the Tax Court failed to note. It was contended below, and it was contended before us by Government counsel that Meiselman did not enter this transaction for the purpose of getting out of the theatre business but in order to raise the money to pay off over $123,000.00 in pressing civil liabilities. The inference is that he intended only to lease such of his theatres as would be necessary to raise the money and then go back into the business upon the termination of those leases.

Meiselman testified that he sold the theatres in order to cut down his business operation because of the conjunction of two factors: (1) his doctor's orders to limit his activities, and (2) the unavailability of his son to assume the responsibility of operating these theatres, due to induction into the Army. He further testified in detail that he had sources available to raise the money to pay off his civil liabilities, if he had needed it, which made either a sale or a lease of any of his theatres for this purpose unnecessary. All of this testimony is undisputed. Meiselman never claimed that he intended to get out of the theatre business entirely but only to reduce his operations. This we think is sufficient to negate the Government's contention that petitioner never intended a sale. The fact that he leased rather than sold the realty is inconsistent with this intent the Government has sought to impute to him. If the purpose of this transaction had been to raise needed funds he could have raised more money with less curtailment of his operations by selling the realty as well as the businesses. A sale of the realty would have given him immediate access to greater amounts of cash than would a lease of it. He did not intend, however, to unnecessarily curtail his income by a sale of any asset that would not require an undue amount of his personal attention. The realty was such an asset and he accordingly retained it. Therefore, not only is the lease of the realty not objectively inconsistent with a sale of the businesses but in addition it tends to show in conjunction with these other facts, a subjective intent that negates a lease of the businesses as going concerns. Furthermore, these background motives, expressed by the parties or inferred by the Court, are not sufficiently impelling in either direction to overcome the clear import of the oral or the subsequent written contracts.

Secondly, the four contractual provisions which the Tax Court found to show that a lease rather than a sale was intended do not give any substantial support to that finding. The provisions relied on were those, (1) requiring the transferor to insure the property transferred for the parties as their interest should appear, (2) requiring the transferee to maintain the interior of the theatres and the equipment in reasonably good condition subject to normal wear and tear, (3) giving the transferor an option to re-purchase the equipment from the transferee at the end of the term of each lease for a nominal sum, and (4) providing that the unpaid balance of the purchase price should be evidenced by unsecured notes. We believe that there is adequate business purpose for each of these provisions which is not inconsistent with a sale of these businesses.

As to the first, the amount of rental of several of the premises was determined by the income of the business operated thereon. The contract required that the insurance be payable to landlord or tenant of the realty "as their interests shall appear". Therefore, if there were a sale of the theatre as a going concern, then nothing else appearing the tenant of the realty would be entitled to the proceeds of the policy attributable to the then value of the trade fixtures. In view of the fact that the amount of rental on the realty was determined by income of the business, the transferor had a real interest in seeing to it that the transferee had sufficient funds to replace the equipment and keep the theatre in operation *even though* the property interest in the equipment had passed *in toto* to the

transferee. If the transferee could not repair or replace the equipment in a theatre as it wore out or was damaged or destroyed, then it could not continue to operate that theatre. Therefore, the Court's assumption that this is *ex necessitatas* inconsistent with a sale is incorrect.

As to the second provision, this was not inconsistent with a sale for the same reason that the first was not. It, too, was aimed at assuring that the gross receipts of the theatres should not decrease, thus affecting the amount of rental to be paid on the realty and the transferee's capacity to meet the rental payments on the realty.

As to the third provision, there is ample undisputed evidence in the record that the option to repurchase was given to the transferor to protect his interest in the reversion of the realty and to assure the transferee that he would not have to bear the expense of removal. It is true that the parties felt certain that the option would be exercised, because the cost of removing the equipment was excessive; it would have little or no value outside of the respective theatres, and its normal expected useful life would have been exhausted. Furthermore, we think the Tax Court ignored the economic realities of the situation. The uncontradicted evidence in the case indicated that the various pieces of equipment involved had a useful life expectancy of from four to twelve years; that at the time of the sale the equipment was from two to twelve years of age; thus it would be from ten to twenty-one years of age when the lease terminated. Stellings was not obligated to replace the equipment but only to keep it in operating condition, normal wear and tear excepted. In innumerable cases where the Tax Court has chosen to hold a document denominated a lease by the taxpayer to be in fact a sale it has insisted that the fact that the so-called lessee was acquiring a substantial equity in the property was if not determinative at least a major factor. Breece Veneer & Panel Co. v. Commissioner, 232 F.2d 319 (7 Cir. 1956);

Oesterreich v. Commissioner, 226 F.2d 798 (9 Cir. 1955); Benton v. Commissioner, 197 F.2d 745 (5 Cir. 1952). Here the evidence clearly indicated that the consideration paid under the contract exceeded the economic value of the equipment, and furthermore, that the equipment would have no substantial value at the termination of Stellings' lease. We think these factors clearly indicate that the transferee did in fact acquire not just a substantial equity but the entire economic value of what he purported to purchase and thus the option to repurchase was relatively insignificant in the scheme of things.

As to the fourth provision, it was established, and the Tax Court agreed, that the equipment was of little value except as part of a going theatre business. Therefore, it was not of any significant value as security for the price of the businesses as going concerns. Meiselman could not have recouped any appreciable part of the contract price by levying on the equipment, removing it from the theatres, and selling it. Thus, his failure to require that it be security for the contract price is not inconsistent with a sale.

We are satisfied that this transaction was not endowed with any abnormality either of form or substance. This is all that is required. The Commissioner must not ignore the traditional practices of the particular business in reaching a categorization of such a transaction as this. Thus the Commissioner is not justified on the facts here in equating this case with those in which the taxpayers attempted to sever large commercial buildings from the realty on which they stood by "selling" the former and simultaneously taking long term leases on the latter as in Lindley's Trust No. 1 v. Commissioner of Internal Revenue, 120 F.2d 998 (8 Cir. 1941).

The Tax Court placed great emphasis on the fact that the consideration expressed for the personalty bore no relation either to its depreciated value or its in-place value. In actuality it was far in excess of either. From this, it drew

the inference of a lease. We fail to see the logic of the Court's position. These theatres, as going concerns, had only two assets of any substantial value, equipment and good will. Both parties testified they first made an oral agreement to sell all of the theatres as a "package deal" for an over-all price. There is evidence which clearly relates this price to the net profits of the theatres as a group. We think it clear that a substantial part of the price was allocable to the good will which obviously went with the transfer. Hatch's Estate v. Commissioner, 198 F.2d 26 (9 Cir. 1952); Pfleghar Hardware Speciality Co. v. Blair, 30 F.2d 614 (2 Cir. 1929).

■ Both good will and equipment were capital assets. It was immaterial to Meiselman taxwise that the entire consideration was attributed to equipment. It was of substantial advantage to Stellings-Gossett. Regulation § 1.167(a)–3; see Copperhead Coal Co. v. Commissioner, 272 F.2d 45 (6 Cir. 1959). The latter drew the contract. Meiselman changed it only to reallocate the proceeds as between his several corporations and partnership. We are inclined to feel that the consideration thus paid for the good will is further evidence of a sale as distinguished from a lease. In any event we fail to see that it evidenced the latter.

The Commissioner has argued that this appeal involves only questions of fact and inferences of fact and that we are not to overrule the Court unless its judgment is clearly erroneous. This is the rule laid down in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). While the language used by the Court in the opinion in that case (at 290, 80 S.Ct. 1199) may be taken to limit the applicability of this rule to determinations of whether or not a payment is a gift or is ordinary income, we do not now find it necessary to pass on this point. We merely note that the Second Circuit has recently held that such a limitation was not intended by the Court. Austin v. Commissioner, 298 F.2d 583 (2 Cir.1962). We here apply the "clearly erroneous" test. It is not, therefore, necessary for us to determine whether the central issue of lease or sale is one of law, of fact, or of mixed law and fact.

For the foregoing reasons, the decisions of the Tax Court are reversed.

Reversed and remanded.