Leonard Marcus and Muriel B. Marcus v. Commissioner.
Marcus v. Commissioner
Docket No. 2991-68.
United States Tax Court
T.C. Memo 1971-299; 1971 Tax Ct. Memo LEXIS 29; 30 T.C.M. (CCH) 1263; T.C.M. (RIA) 71299; November 29, 1971, Filed. Edwin Fradkin and Harvey R. Zeller, for the petitioners. John J. O'Toole, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the Federal income tax due from the petitioners as follows: Year
Deficiency
1958
$ 2,040.25
1959
143,854.90
1960
52,819.26
1961
31,496.77
1962
27,136.66
1963 28,073.99
Total Deficiency
$285,421.83
The issues presented for decision in this proceeding relate to the following: (1) The determination of the basis to be used for depreciation of certain bowling alleys. (2) The amount of capital gain realized by petitioner Leonard Marcus as a result of the 1959 liquidation of a corporation in which he was a shareholder. (3) The allowable travel and entertainment expenses incurred by petitioner Leonard Marcus in the years 1958, 1959, and 1961. (4) The disallowance of a loss claimed by petitioner Leonard Marcus on account of certain rental property. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and the exhibits attached *31 thereto are incorporated herein by this reference. The petitioners Leonard Marcus (hereinafter referred to as the "petitioner") and Muriel B. Marcus [1] are individuals, husband and wife, who were legal residents of West Englewood, New Jersey at the time of the filing of the petition in this case. The petitioners filed their joint income tax returns for the taxable years 1958 through 1963, inclusive, with the district director of internal revenue, Newark, New Jersey. In each of the years in question to which the depreciation issue relates, the deficiency asserted was due in whole or in part to the respondent's redetermination of the amount of the depreciable basis for each of the bowling establishments in question. In the case of Faller's New Milford Bowl-O-Drome (hereinafter referred to as "Faller's"), which is owned individually by the petitioner, the respondent, in certain of the years in question, denied in part the amounts which petitioner claimed as depreciation deductions on that establishment. *32 As a consequence, the petitioner's taxable income was increased in the years to which this denial was applicable. The increase in taxable income due to such denial provided the basis for at least part of the deficiencies in the petitioner's income tax for the years in which such depreciation deductions are now in issue. 1264 In the case of the other bowling establishments in question, which are and/or were owned by either a partnership venture in which the petitioner was a general or limited partner or a subchapter "S" corporation in which the petitioner was a shareholder, the respondent, in certain of the years in question, denied in part the amounts which were claimed as depreciation deductions by the entity owning a given alley. Consequently, in each such instance, the petitioner's distributive share of partnership or corporate income was increased. This of course increased the petitioner's taxable income in the years in which the denial took place. In turn, this increase provided the basis for at least part of the deficiencies in income tax for the years in which such depreciation deductions are now in issue. Prior to 1958, petitioner was a certified public accountant. *33 Subsequent to that date, he was in the real estate and investment business. Petitioner initially became interested in bowling alleys in 1958 through conversations with one Fred Kaplan (hereinafter referred to as "Kaplan"). At that time, Kaplan owned Faller's, which was located in New Milford, New Jersey. Petitioner discussed with Kaplan, whom he had known for years, the prospects of purchasing Faller's. He did so because he was always searching for investments in business ventures and realized the potential for cash flow profits emanating from bowling establishments at this time. Generally, during the years in issue, the cost of a single new bowling alley, including freight and installation with equipment and supplies, was $5,500. During the same period, the cost of a single new unit of pinsetter equipment, including freight and installation, was $8,000. Petitioner explored the possibility of constructing new bowling alleys but found that it would take approximately six months to one year to make a new bowling alley operational. By purchasing existing and operational alleys, petitioner could avoid this delay. In the case of each of the bowling establishments involved in this case, *34 the petitioner purported to purchase only the lanes (actually flooring) or the lane and the pinsetters; the buildings in which these assets were located were leased. Kaplan had received an offer of approximately $400,000 from other persons for the purchase of Faller's. This transaction was not consummated, and subsequently petitioner offered Kaplan a considerably higher price and smaller down payment for the acquisition of Faller's. Faller's bowling establishment consists of 20 bowling alleys containing American Machine and Foundry (hereinafter referred to as "AMF") pinsetters. The differentiation between AMF pinsetters and those manufactured by Brunswick Corporation (hereinafter referred to as "Brunswick") was that AMF pinsetters could only be used on a rental basis while Brunswick sold its pinsetters. Prior to any agreement, the petitioner examined the books and records of Faller's and a copy of its income tax return. The books and records of Faller's, as well as the corporate tax returns, disclosed no reportable profit for income tax purposes. On November 24, 1958, the petitioner entered into an agreement with Kaplan wherein he acquired the entire capital stock of Faller's *35 for the sum of $955,000. Under the terms of the agreement, the sum of $40,000 was paid upon execution of the contract. The sum of $40,000 was payable in cash or by certified check at closing, and the balance of $875,000 was to be payable over a period of years in equal quarterly installments with the last installment due on June 30, 1974. The agreement also provide that the financial responsibility of the petitioner and/or his assignee was limited to the payment of cash required to be paid at the closing of title and to a series of 12 notes given by the petitioner in payment for certain assets in addition to and apart from the capital stock of Faller's, the agreement requiring the cost of such assets to be added to the basic purchase price of $955,000. As to the liability of the petitioner under the promissory notes or obligations which he gave in payment of the basic purchase price, the agreement provided that the seller's only recourse was to the security of the property acquired in the transaction (the stock of Faller's). The agreement of November 24, 1958 did not provide for the payment of interest, and no interest as such was paid on this transaction. However, in arriving *36 at his proposed contract price, the petitioner estimated the value of Faller's to be $400,000 (said estimate being based on the previous offer of $400,000), exclusive of interest, and then "calculated a certain amount of interest at six percent per annum over a period 1265 of time" which was to be the term of the proposed contract. The sum of this estimated value and his calculation of interest was the basis of the price specified in the contract. At the time of these calculations, petitioner estimated that the term of the contract would be 20 years, but in fact it was 17 years subject to renewal. Petitioner also took over a lease, dated March 25, 1954, between Brookchester Shopping Center, Inc. and Faller's. The lease period had commenced on April 1, 1954 for a period of 20 years at an annual rental of $15,000 for the first ten years and at an annual rental of $22,000 for the second ten-year period. At the present time, the petitioner still retains ownership of Faller's and has paid approximately $500,000 of the price specified in the acquisition contract for this establishment. For purposes of depreciation, petitioner took as a basis for the alleys at Faller's the sum of *37 $998,500, using a ten-year life and the 150 percent declining balance method of depreciation. This sum included the amount of $955,000 which was specified in the contract of November 24, 1958. Petitioner claimed depreciation with respect to Faller's on Schedule "C" of his Form 1040 in the sum of $150,529.85 for the year 1959; the sum of $128,258.45 for the year 1960; the sum of $109,243.39 for the year 1961; the sum of $93,125.39 for the year 1962; and the sum of $82,996.63 for the year 1963. Petitioner subsequently became interested in the acquisition of Washington Bowl (hereinafter referred to as "Washington"). Washington was built in 1959 and consisted of 36 Brunswick bowling alleys. After extended negotiations with the owners, an agreement was arrived at and a contract was entered into on January 5, 1960. Pursuant to the contract, the petitioner agreed to acquire all the outstanding capital stock of Belleville Equipment Corporation and Belleville Restaurant Corporation, which corporations owned and operated Washington and other enterprises connected with the bowling establishment, for a total price of $2,480,000 to be paid over a period of 50 years. Under the terms of the agreement, *38 the sum of $50,000 was paid upon execution of the contract, the sum of $145,000 was payable upon closing of title, and the balance of $2,285,000 was to be payable in installments and was evidenced by a noninterest-bearing promissory note having a term of 50 years. The agreement further provided that the liability of the purchaser under the promissory note and his liability for any other obligations specified in the contract were limited to the property acquired in the transaction. The agreement also specifically stated that the purchaser was "in no event" to be personally liable on his note or any of his other contractual obligations. Thus, in the event of a default on the part of the purchaser, the seller's only recourse was to the property which he sold. The agreement of January 5, 1960 did not provide for the payment of interest, did not specify any interest factor, and no interest as such was paid on this transaction. However, in arriving at the proposed contract price, the petitioner estimated the value of Washington to be approximately $700,000 or $750,000, exclusive of interest, and calculated interest at six percent over the term of the contract. The sum of petitioner's *39 estimated value for Washington and his interest calculation was the basis of the purchase price or sale price specified in the contract. Pursuant to the agreement of January 5, 1960, the owner of Washington subleased to the petitioner the premises in which Washington operated. The term of the lease was for 19 1/2 years commencing February 1, 1960 with an option to extend the lease for three separate and successive periods, each period being for ten years. The basic rent was $679,583.34 payable in equal monthly installments of $2,916.66 commencing February 1, 1960. The agreement of January 5, 1960 was contingent upon the execution of this sublease and upon the original lease not being in default. Petitioner subsequently transferred the agreement of January 5, 1960 to Washington Bowl, Inc. (hereinafter referred to as "Washington Inc.") which qualified as a subchapter "S" corporation. On the 1960 Form 1120-S filed by Washington Inc. for the period February 2, 1960 to December 31, 1960, Washington Inc. Took the sum of $2,787,988.83 as the basis of the machinery, furniture, and equipment acquired from Washington. This sum included the the amount of $2,480,000 which was specified in *40 the contract of January 5, 1960 as the acquition cost of Washington. Washington Inc. claimed depreciation for machinery, furniture, and equipment, using a 20-year useful life and the 150 percent declining balance method. In 1963, Washington, Inc. changed to the straight line method of depreciation. For the year 1960, the sum 1266 of $191,674.23 was deducted (taken as ordinary depreciation) by Washington as depreciation on account of the assets it had acquired from the petitioner. For the years 1961, 1962, and 1963, the respective sums of $194,723.60, $180,119.23, and $130,037.36 were claimed by Washington as depreciation with respect to this property. Petitioner entered into an agreement dated January 18, 1960 for the acquisition of all the outstanding capital stock of Bowler City, Inc. (hereinafter referred to as "Bowler City"), a New Jersey corporation with its principal office in Hackensack, New Jersey. Bowler City contained 50 bowling alleys and it was a Brunswick operation. These alleys are still being operated by the petitioner who, after consummation of the agreement of purchase, owned individually 85 percent of the Bowler City stock. The agreement specified $5,225,000 *41 as the price for Bowler City to be evidenced by a noninterest-bearing promissory note payable in installments over a 40-year period. The agreement further provided that the liability of the purchaser to pay the promissory note or any other obligation incurred under the contract was limited to the property acquired in the transaction (the stock of Bowler City) and that in no event was the purchaser to be personally liable. The agreement also specified that no action was to be brought by the sellers against the purchaser to recover a personal judgment against him, except a personal guarantee undertaken by the purchaser to the sellers to the extent of $125,000. This guarantee could be satisfied by endorsement of the first successive payment on account of the price for $65,000 for the first year and $60,000 for the second year. The agreement of January 18, 1960 did not provide for the payment of interest, did not specify any interest factor, and no interest as such was paid on this transaction. However, in arriving at a proposed contract price, the petitioner estimated the value of Bowler City to be $1,000,000, exclusive of interest, and calculated a premium for the long payment period *42 of the note. The sum of petitioner's estimated value for Bowler City and his premium calculation was the basis of the contract price agreed upon by the parties. As a condition of the agreement of January 18, 1960, it was agreed that the sellers would convey, assigning all rights thereto, a lease in existence between Bowler City and River Realty Co. The term of the lease was 50 years commencing March 1, 1960 and ending February 28, 2010, with rent at the rate of $127,500 for the first 30 years of the lease, then at the rate of $137,500 for the next succeeding ten years, and then at the the rate of $260,000 for the remaining ten years, all payable in equal monthly installments. The lease concerning Bowler City was negotiated by the petitioner with the owners of the property who were also the sellers of the bowling alleys. Bowler City was a qualified subchapter "S" corporation. On or about March 24, 1961, Bowler City adopted a plan of liquidation. It was liquidated on or about March 31, 1961, and all the assets were transferred to a partnership, Bowler City, Ltd.
On January 23, 1962, petitioner, as a general partner of Bowler City, Ltd., entered into an agreement with River Realty *43 Co. varying the amount of the original note to be paid annually against the purchase price. The agreement did not vary the total amount of the contract price; rather, it varied the method of payment. On the 1960 Form 1120-S filed by Bowler City for the period February 2, 1960 to December 31, 1960, Bowler City set forth the sum of $5,735,474.03 as the cost of machinery, equipment, and fixtures accquired pursuant to the agreement of January 18, 1960. This sum included the amount of $5,225,000 which was specified in the contract of January 18, 1960 as the acquisition cost of Bowler City. Bowler City established depreciation for machinery, equipment, and fixtures, using a 20-year life and the straight line method of depreciation. Depreciation was deducted on the original acquisition in the sum of $238,978.09 (taken as ordinary depreciation) for the year 1960, and additional depreciation was taken for the short year January 1, 1961 to March 31, 1961. After the transfer of the assets of Bowler City to a general partnership, Bowler City, Ltd., depreciation was deducted on the Form 1065 filed by Bowler City, Ltd. for the short year April 1, 1961 to December 31, 1961 in the sum of $215,080.28 *44 (taken as ordinary depreciation), the sum of $286,773.70 for the year 1962, and the sum of $286,773.70 for the year 1963. After a series of negotiations between the petitioner and the owners of Dreamland Bowling Arena (hereinafter referred to as "Dreamland"), petitioner acquired the Dreamland alleys, which were located in Newark, New Jersey, for the sum of $1,339,058.10. 1267 Dreamland had originally been acquired by the sellers in 1954 and was opended as a bowling center in September, 1955. The cost of the entire operation was approximately $525,000, and the bowling alleys returned a profit until 1961. Dreamland contained 52 lanes and was an AMF operation. The sellers had originally been approached by Kaplan, and they were asking $700,000 for the alleys, said sum to be paid by payment of $500,000 upon acquisition and $200,000 in "paper." It was through Kaplan that the petitioner was informed of the fact that Dreamland was available for purchase. The acquisition of Dreamland was made by New Dream Bowling Arena, Ltd. (hereinafter referred to as "New Dream"), a limited partnership in which the petitioner was a general partner. The sum of $1,339,058.10 was payable under a promissory *45 note dated November 30, 1960 with a term of 50 years. The agreement provided that the liability of the purchaser under the promissory notes or obligations which were given in payment was limited to the security of the property acquired in the transaction and that, in the event of default, the seller's only recourse was to this property. The agreement for Dreamland did not provide for the payment of interest, did not specify any interest factor, and no interest as such was paid on this transaction. However, in arriving at a proposed contract price, the petitioner estimated the value of Dreamland to be $500,000, exclusive of interest, and calculated a premium for the long payment period of the note. The sum of petitioner's estimated value for Dreamland and his premium calculation was the basis of the contract price agreed upon by the parties. A lease was entered into between 985 Frelinghuysen Avenue Corporation and New Dream on November 23, 1960. The yearly rent was set at $55,000, payable in equal monthly installments. The term of the lease was 50 years. The lease was entered into with the owners of the building who were also the sellers of the alleys. On the 1960 Form 1065 filed *46 by New Dream for the short year October 1, 1960 to December 31, 1960, New Dream set forth the sum of $1,339,058.10 as the cost of machinery, equipment, and fixtures it acquired on the purchase of Dreamland. New Dream established depreciation for machinery, equipment, and fixtures, using a 16-year life and the 150 percent declining balance method, although this latter rate was revised in 1962 pursuant to Rev. Rul. 62-21. Depreciation was deducted on the original acquisition in the sum of $31,882.34 (taken as ordinary depreciation) for the year 1960. The partnership claimed depreciation expense as a deduction in the amount of $122,547.73 for the year ended December 31, 1961, and the sum of $62,193.04 for the period ended May 6, 1962. Alfred Levin (hereinafter referred to as "Levin"), a realtor for 30 years, was the broker with regard to the acquisition by petitioner of the Morris Plains Lanes, the East Paterson Lanes, the Lyons Lanes, and the Parkway Lanes, Levin solicited the various owners of these lanes for a listing for the sale of each of these respective bowling alleys and in the process would receive the proposed sales price from the respective owner. The figures *47 set forth on the listings were obtained from the owners for future presentation to potential buyers, including the petitioner. Levin received instructions from the owners as to prices required and had a listing for the Morris Plains Lanes (hereinafter referred to as "Morris Plains"). Morris Plains contained 30 lanes and was an AMF establishment. The listing indicated a desired sales price of $40,000 with a request of 25 percent cash. This price did not include interest. Petitioner entered an agreement dated May 18, 1961 with Morris Plains, a New Jersey corporation located in Morris Plains, New Jersey, to acquire all right, title, and interest in the assets and premises of Morris Plains for a total purchase price of $779,500. Under the terms of the agreement, the sum of $15,000 was payable upon execution of the agreement, $97,500 was payable upon closing of title, and the balance of $667,000 was payable under a series of promissory notes payable over a 27-year period. The agreement further provided that neither the purchaser nor the general partners of a limited partnership, to which the purchaser could assign his rights and obligations under the agreement, were to be personally *48 liable under the agreement or on any notes delivered. The agreement also specified that the purchaser's obligations were to be "secured by a purchase money chattel mortgage on all fixed assets sold, including after acquired property, but excluding expendable equipment." Hence, the liability of the purchaser under the promissory notes or obligations 1268 which were given in payment was in effect limited to the security of the property acquired in the transaction; and, in the event of default, the sellers only recourse was to this property. However, the agreement did provide that if the petitioner sold or transferred all or part of his interest in the alleys acquired in the transaction, either as an individual or as a general partner, at any time after closing but before the seller had received a total of $65,000, the petitioner would personally pay to the seller in cash, at the time of such sale or transfer, the amount necessary to bring the total payments to the seller up to $65,000. The agreement of May 18, 1961 did not provide for the payment of interest, did not specify any interest factor, and no interest as such was ever paid on this transaction. However, in arriving at *49 the proposed contract price, the petitioner estimated the value of Morris Plains to be approximately between $250,000 and $300,000, exclusive of interest, and calculated an interest factor over the term of the proposed contract. The sum of petitioner's estimated value for Morris Plains and his interest calculation was the basis of the purchase price specified in the contract. Petitioner and the owners of Morris Plains were each represented by their own counsel at the closing of the sale of Morris Plains. Levin received a commission for his services as broker. Simultaneously with the execution of the May 18, 1961 contract, the sellers of Morris Plains represented to the petitioner that the lease currently in effect for the premises would be in full force and effect at the date of closing and that they had the right to assign said leasehold to the petitioner or to a limited partnership. The lease was assigned to petitioner and provided for a lease of 20 years with annual payments of $31,250. On the Form 1065 filed by Morris Plains Bowling Lanes, a partnership in which the petitioner was a general partner, for the short year May 1, 1961 to December 31, 1961, the partnership set *50 forth the sum of $838,933.03 as the cost of the machinery, equipment, and fixtures acquired on the purchase of Morris Plains. This sum included the amount of $779,500 which was specified in the contract of May 18, 1961 as the acquisition cost of Morris Plains. The partnership established depreciation for machinery, equipment, and fixtures, using a 13-year life and the 150 percent declining balance method. In 1962 and 1963, the partnership used a ten-year useful life. For the period May 1, 1961 to December 31, 1961, depreciation was deducted on the original acquisition in the sum of $76,994.80 (taken as ordinary depreciation), and $13,500 was deducted as additional first year depreciation for the same period. The partnership claimed depreciation expense in the amount of $114,290.73 for the year ended December 31, 1962 and in the amount of $97,149.13 for the year ended December 31, 1963. Levin also had a listing from the owners of East Paterson Lanes (hereinafter referred to as "East Paterson"), formerly Martone Lanes, and had received instructions as to prices required. East Paterson contained 32 bowling alleys and was a Brunswick establishment. The listing indicated a desired sales *51 price of $475,000 with a request for a 29 percent down payment and a mortgage of eight years at six percent interest for the balance. Petitioner entered into an agreement, dated February 6, 1961, with M. & V. Co., a partnership, for the acquisition of all the personal and physical assets of East Paterson for the sum of $1,711,000. Under the terms of the agreement, the sum of $45,000 was to be paid upon execution of the contract, and the balance was to be paid in a series of notes with the last coming due in the year 2000. The agreement further provided that as security for the notes, the purchaser was to execute at the closing a chattel mortgage on the "trade fixtures, furniture, equipment, files, records and assets" of the seller "without personal liability as collateral for the said notes * * *." The agreement specified that the liability of the purchaser for the payment of the notes and for any other obligations under the agreement was limited to the security arrangement detailed above and without personal liability. The agreement also provided that "in any event," no action or proceeding was to be brought by the seller against the purchaser or his assigns to recover a personal *52 judgment "upon the promissory note or upon the accompanying chattel mortgage." The agreement of February 6, 1961 did not provide for the payment of interest, did not specify any interest factor, and no interest as such was ever paid on this transaction. However, in arriving at the proposed contract price, the petitioner estimated 1269 the value of East Paterson to be $600,000, exclusive of interest, and calculated an interest factor over the term of the proposed contract. The sum of petitioner's estimated value for East Paterson and his interest calculation was the basis of the purchase price specified in the contract. Petitioner and the owners of East Paterson were each represented by their own counsel at the closing of the sale of East Paterson. Levin received a commission for his services as broker. The agreement of February 6, 1961 provided that simultaneously with the execution of that agreement, petitioner would receive a lease of the premises from the landlord, M. & V. Co. It also provided that Levin was retained as a broker for purposes of the leasehold transaction. Pursuant to the stipulation in the agreement of February 6, 1961, a lease between the petitioner *53 and M. & V. Co., dated February 6, 1961, was executed simultaneously with the agreement of February 6, 1961. The lease was for a term of 40 years begining January 15, 1961 and established an annual net rental of $33,000 for the first 30 years and an annual net rental of $39,600 for the remaining ten years of the leasehold. On the Form 1065 filed by Martone Lanes (hereinafter referred to as "Martone"), a partnership in which the petitioner was a general partner, for the period January 15, 1961 to December 31, 1961, the partnership set forth the sum of $1,973,396.97 as the cost of the machinery, equipment, and fixtures acquired on the purchase of East Paterson. This sum included the amount of $1,711,000 which was specified in the contract of February 6, 1961 as the acquisition cost of East Paterson. The partnership established depreciation for equipment, machinery, and fixtures, using a 13-year life and the 150 percent declining balance method. In 1962 and 1963, depreciation was calculated on the basis of a ten-year useful life. Depreciation was deducted on the original acquisition in the sum of $296,480.69 (taken as ordinary depreciation) for the year 1961, and the amount of $88,000 *54 was deducted as additional first year depreciation for the same period. The partnership claimed depreciation in the amount of $335,383.26 for the year ended December 31, 1962, and East Paterson claimed depreciation expense of $129,960.84 for the year ended December 31, 1963. In 1961, Levin had a listing from the owners of Lyons Lanes (hereinafter referred to as "Lyons") and had received instructions as to prices required. Lyons contained 40 bowling alleys and was a Brunswick establishment. The listing indicated a desired sales price of $700,000 with a cash down payment of $200,000 with the balance to be paid by a 30-year mortgage at six percent interest. The listing also indicated a 30-year lease with a 30-year option to renew. On or about June 29, 1961, petitioner entered into an agreement to acquire all outstanding and issued shares of stock of Lyons and Lyon Cage, Inc., a New Jersey corporation located in Irvington, New Jersey, for a total price of $1,147,000. Under the terms of the agreement, the contract price was payable under promissory notes which were payable over a 30-year period and which were secured by a chattel mortgage on all the goods and property composing the *55 Lyons bowling establishment. Lyons is still being operated by the petitioner. The agreement provided that the liability of the purchaser "to pay the promissory notes and any obligations thereunder" was limited to the security arrangement described above, which in turn was applicable only to the property acquired in the transaction. The agreement further provided that there was to be no personal liability and that no action or proceeding was to be brought by the seller against the purchaser, his assigns, or his successors to recover a personal judgment on the promissory notes or the accompanying chattel mortgage. The agreement of June 29, 1961 did not provide for the payment of interest, did not specify an interest factor, and no interest as such was ever paid on this transaction. However, in arriving at the proposed contract price, the petitioner estimated the value of Lyons to be $700,000, said estimate being based on the listing price, and calculated an interest factor over the term of the proposed contract. The sum of the petitioner's estimated value for Lyons and his interest calculation was the basis of the purchase price specified in the contract. Petitioner and the owners *56 of Lyons were each represented by their own counsel at the closing. In addition, Levin received a commission for his services as broker. The agreement of June 29, 1961 provided that the said agreement was contingent 1270 upon the petitioner's acquisition of a lease from the landlord (also the seller in the contract of sale) for a minimum period of 30 years and at a maximum net rental of $49,500 per annum. On June 29, 1961, a lease was entered into between the petitioner and Morris Pivnick for the rental of the premises in which Lyons was located for a term of 30 years commencing June 1, 1961. The lease established an annual rental of $48,000, payable in equal monthly installments. On or about June 1, 1961, Lyons Lanes was established as a limited partnership pursuant to the law of New Jersey. The petitioner was a limited partner in said partnership. On the Form 1065 filed by this partnership for the short year June 1, 1961 to December 31, 1961, Lyons Lanes set forth the sum of $1,574,549.99 as the cost of machinery, equipment, and fixtures acquired on the purchase of Lyons. This sum included the amount of $1,147,000 which the contract of June 29, 1961 specified as the acquisition *57 cost of Lyons Lanes. The partnership established depreciation for machinery, equipment, and fixtures, using a 15-year life and the 150 percent declining balance method. Depreciation was deducted on the original acquisition in the sum of $103,825.48 (taken as ordinary depreciation) in the year 1961, and $32,000 was deducted as additional first year depreciation for the same period. The partnership claimed depreciation expense in the amount of $215,808.67 for the year ended December 31, 1962, and depreciation expense was claimed in the sum of $183,437.38 for the year ended December 31, 1963. Levin had a further listing from the owners of Parkway Lanes (hereinafter referred to as "Parkway") and had received instructions as to prices required. Parkway contained 36 bowling alleys and is an AMF establishment. The listing indicated a desired sales price of $575,000 with a requested cash down payment of 29 percent plus $50,000 with the balance to be paid with a ten-year six percent mortgage. Levin was retained by Parkway as the broker with respect to the transaction which developed between the petitioner and the owners of Parkway. Petitioner entered into an agreement, dated April 7, 1962, with *58 the shareholders of Parkway and Parklane Cocktail Bar, Inc., a New Jersey corporation, for the acquisition of all the outstanding and issued shares of stock of said corporation for the sum of $880,000. Under the terms of the agreement of April 7, 1962, the contract price was payable as follows: $15,000 upon closing, and the balance payable by a series of promissory notes to be paid over a term of 326 months (27 1/6 years). Parkway is still being operated by the petitioner. The agreement provided that the liability of the purchaser under "the promissory notes and any obligations thereunder and in connection therewith" was limited to a security arrangement which in effect was applicable only to the property acquired in the transaction. The agreement specified that there was to be no personal liability on the part of the purchaser and that in any event, no action or proceeding, except in the case of willful misconduct or fraud, was to be brought by the sellers against the purchaser, his assigns, or his successors to recover a personal judgment on the promissory notes or the accompanying security arrangement. The agreement of April 7, 1962 did not provide for the payment of interest, *59 did not specify an interest factor, and no interest as such was ever paid in this transaction. However, in arriving at the proposed contract price, the petitioner estimated the value of Parkway to be $300,000, exclusive of interest, and he calculated an interest factor which he applied to this estimated value over the term of the proposed contract. The sum of the petitioner's estimated value for Parkway and the amount derived from his interest computation was the basis of the purchase price specified in the contract. Petitioner and the shareholders of Parkway were each represented by their own counsel at the closing. Levin received a commission for his services as broker. The agreement of April 7, 1962 provided that said agreement was contingent upon the petitioner's acquisition of a lease from the landlord (the "seller" in the contract of April 7, 1962) for a minimum period of 31 years at a maximum rental of $48,000 per annum. On April 7, 1962, a lease was entered into between J.C.B. Realty and Parkway for the rental of the premises in which Parkway was located for a term of 31 years commencing April 1, 1962. The lease established an annual rental of $48,000. Parkway was established *60 as a limited partnership under the name of Parkway Lanes. The arrangement was made pursuant to the Limited Partnership Law of the State of New Jersey. The partnership commenced on April 1, 1962, and it is to 1271 continue in existence until March 31, 1993. The petitioner was a limited partner in said partnership. On the Form 1065 filed by the partnership for the short year April 1, 1962 to December 31, 1962, the partnership set forth $1,020,319.99 as the cost of machinery, equipment, and fixtures acquired on the purchase of Parkway. This sum included the amount of $880,000 which the contract of April 7, 1962 specified as the acquisition cost of Parkway. The partnership established depreciation for machinery, equipment, and fixtures, using a ten-year life and the double declining balance method. Depreciation was deducted on the original acquisition in the sum of $132,807.75 (taken as ordinary depreciation)for the short year 1962, and the amount of $132,000 was deducted as additional first year depreciation for the same period. For the year ended December 31, 1963, the partnership claimed depreciation in the amount of $84,610.91. Petitioner defaulted on the following properties, *61 as indicated, and the property reverted to the seller: New Dream Bowling Arena, Ltd. - after one and a half or two years. Morris Plains Bowling Lanes - after three years. East Paterson Lanes - after two years. Washington Bowl, Inc. - after three years. Jonas Schreiber (hereinafter referred to as "Schreiber") of West Orange, New Jersey, is an actuary who, at the petitioner's request, made computations for each of the bowling alleys involved herein with respect to the actuarial present value of future expected payments. The figures upon which the computations were based were supplied by counsel for the petitioner. With respect to each of the alleys involved in this case, Schreiber, pursuant to a payment scheduled supplied by petitioner's counsel, computed the actuarial present value of future expected payments (exclusive of any initial down payment). In the case of each of the alleys in question, the total of the payments to be made, as set forth in the supplied payment schedule, was, for purposes of the computation, the equivalent of the sale price established by the contract of sale for each of those alleys. In each computation, Schreiber was asked to assume "as true interest *62 discount of six percent per year compounded annually." Furthermore, Schreiber made his computations on the assumption that all payments would be made and did not take into consideration any contingencies which could arise to prevent such complete payment of the contract price specified for each alley. The various alleys and the present value of future expected payments as to each of those alleys as computed and estimated by Schreiber are as follows: Present Value Of
Future Expected
Payments (Ex-
clusive Of Any
Initial Down
Property
Payment)
Faller's
$ 490,826
Washington Bowl, Inc
609,725
Bowler City, Inc
1,887,903
New Dream
396,864
Morris Plains
304,526
East Paterson
536,370
Lyons Lanes
795,794
Parkway Lanes
402,739
All of the partnerships and subchapter "S" corporations which acquired and operated the alleys in question herein were using the accrual method of tax accounting. Petitioner, as an individual, used the cash basis method of accounting. Petitioner intended eventually to have a public issue of stock in an enterprise which controlled the entire chain of the bowling establishments involved in this case. However, the bowling *63 alley business deteriorated so rapidly that such concepts were abandoned. The petitioner also owned 300 shares (24 percent) of the common stock of New Riverview, Section One, Inc. (hereinafter referred to as "New Riverview"), a New Jersey corporation. In 1955, 1956, 1957, and 1958, New Riverview distributed dividends out of capital surplus. These distributions by New Riverview were treated as a return of capital to the shareholders. By 1958, such treatment had resulted in the reduction of the stockholders' basis in the stock of New Riverview to zero. On or about June 16, 1958, the petitioner entered into an agreement to purchase the remaining 950 outstanding shares of New Riverview stock from the stockholders at $1,160 per share. The shares of New Riverview were owned on the following dates as follows: 1272 No. Shs.
No. Shs.
No. Shs.
Stockholders
6/15/58
6/20/58
Jan. 1959
Unrelated Interests
795.00
795.00
0
John Marcus Trust
51.67
151.67
0
Peter Marcus Trust
51.66
151.66
0
Richard Marcus Trust
51.67
151.67
0
Leonard Marcus 300.00
0
1,250
1,250.00
1,250.00
1,250
Opinion I. Basis for Depreciation In this case, *64 the petitioner began investing in bowling centers in 1958. His first investment was in Faller's, which he acquired individually. Thereafter, he invested in the Washington Bowl, Bowler City, New Dream, Lyons, East Paterson, Morris Plains, and Parkway bowling establishments. In each of these latter instances, the acquisition was made by a partnership venture in which the petitioner was either a general or limited partner or a corporation in which the petitioner was a stockholder. All of the acquisitions were made in a similar pattern. Upon learning that a particular bowling establishment was available for acquisition, the petitioner, individually or in a representative capacity, would initiate negotiations with the owner and prospective seller. In each case, he purported to purchase only the lanes or the lanes and pinsetters while the buildings in which these assets were located were leased. The price agreed upon in each instance was a significant amount in excess of the price initially requested by the owner-seller. In each instance, the contract also did not specify any element of interest, and the period of the notes given in payment was well in excess of the useful life of the *65 assets. Furthermore, with the exception of Faller's and Bowler City, each of the agreements provided in effect that the purchaser's liability under the promissory note or notes given in payment was limited to the security of the acquired property, and that in the event of default, the seller's only recourse was to this property. The agreements relating to the acquisition of Faller's and Bowler City contained the same basic limitations outlined above. In the case of Faller's, however, the agreement provided in addition that the financial responsibility of the purchaser was limited to the payment of cash requested to be paid at closing. As to Bowler City, the petitioner undertook a personal guarantee to the sellers to the extent of $125,000, which guarantee could be satisfied by endorsement of the first successive payment on account of the contract price for $65,000 for the first year and $60,000 for the second year. Pursuant to the various agreements, four of the properties were in fact turned back to the sellers. Petitioner argues that in the circumstances of this case, where each of the transactions was bona fide and at arm's length as between the parties, the price specified *66 in the contract for the salable equipment of each of the bowling establishments was determinative of cost and is therefore the proper basis for depreciation. In the alternative, petitioner argues that depreciation should be computed on a discounted value of the payments to be made with respect to each establishment, and further he contends that the purchaser of a given alley in question is entitled to interest deductions with respect to each contract and to amortization of each lease negotiated simultaneously with each purchase of assets. Respondent argues that the circumstances of this case require us to find that the replacement or fair market value of the assets in question, as determined by the respondent, is the proper basis for depreciation. Generally, a depreciation deduction for property used in a trade or business or held for the production of income is allowed under section 167(a)[2] which provides: SEC. 167. DEPRECIATION. (a) General Rule. - *67 There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - 1273 (1) of property used in the trade or business, or (2) of property held for the production of income. Section 167(g)[3] of the Code provides that the basis for the depreciation deduction is the adjusted basis provided in section 1011 for purposes of determining gain or loss on the sale or other disposition of such property Section 1011(a)[4] provides that its basis shall be determined under section 1012, which provides that: "The basis of property shall be the cost of such property, * * *." In turn, the cost of such property is generally the amount paid for such property in cash or other property. Sec. 1.1012-1, Income Tax Regs. *68 [5] Thus, in the case of an outright purchase, the amount paid for the property is ordinarily regarded as the depreciable basis. Manuel D. Mayerson, 47 T.C. 340 (1966). In each of the acquisitions in question, the term of the notes given in payment was well in excess of the useful life of the *69 assets. With the exception of Faller's and Boweler City, each of the agreements in question provided that the purchaser's liability under the promissory notes or obligations given in payment was limited to the security of the property acquired in the given transaction; and that in the event of default, the seller's only recourse was to this property. In these instances, the petitioner and his fellow purchasers could in essence turn back the property and be relieved of any further liability. The agreements relating to Faller's and Bowler City contained these same basic limitations; however, as to Faller's, the agreement provided that the financial responsibility of the petitioner was limited to the payment of cash requested to be paid at the closing. In the case of Bowler City, the petitioner undertook a personal guarantee of $125,000, which guarantee could be satisfied by endorsement of the first successive payment on account of the contract price for $65,000 for the first year and $60,000 for the second year. In effect, the petitioner could turn back the property acquired pursuant to the Faller's and Bowler City agreements, incur the limited financial liability established by the *70 above provisions, and be relieved of any further financial obligation. In the factual pattern of this case, the contract price in each of the agreements did not have any real meaning. Even taking each of the various contracts on face, it is difficult to conceive of a situation where the petitioner and/or his fellow purchasers would continue to make payments under the various contracts where the property in question no longer had any useful life and where they would incur no financial liability for failure to make such payments. In fact, the purchasers did default in four of the acquisitions and the property reverted to the respective sellers. Hence, it is clear that, with respect to the acquisition of each bowling establishment, the purchaser's liability and the amount of the obligation incurred were contingent and not ascertainable. The contract price in each instance was not an absolute and unconditional price but a contingent amount which might never be paid, and said price is therefore not determinative for purposes of establishing a basis for depreciation. See Columbus and Greenville Railway Co., 42 T.C. 834 (1964), *71 affirmed per curiam 358 F. 2d 294 (C.A. 5, 1966); Albany Car Wheel Co. Inc.40 T.C. 831 (1963), affirmed per curiam 333 F. 2d 653 (C.A. 2, 1964); and Lloyd H. Redford, 28 T.C. 773 (1957). We also cannot accept the petitioner's alternative argument that depreciation should be allowed based on a discounted value of the obligations incurred with respect to the purchase of the assets of each bowling establishment. We have determined that the amount specified in the contracts of sale for the various establishments is not binding and determinative of cost for purposes of establishing a basis for depreciation because of the contingent nature of the purchaser's 1274 obligation and the amount which would be paid under the various obligations. Any effort to determine the present value of the amount specified as the purchase price in each of the contracts would be meaningless because the purchaser might at any time surrender the assets and discharge any liability on account of the notes. Notwithstanding petitioner's inability to establish either the total which will be paid, or the present value of such payment, it must be assumed *72 that some part of the annual payment is attributable to the use of the property or to the deferment of the payment of any balance coming due in the future, i.e., either in the nature of rent or interest. It is unnecessary, if not impossible, to determine the amount of the total payment attributable to this factor. The respondent contends that the value of the property in each instance (and thus the cost for purposes of establishing a depreciation basis) is the replacement cost. In the case of each of the establishments involved herein, he has determined such cost and allowed depreciation on that basis. To adopt the view of the respondent would be to deny to a taxpayer the right to recover as a charge against operations the actual cost incurred by the taxpayer in the acquisition of depreciable property. Any method of accounting that does not take into account the actual liability incurred and paid for the property would distort the purchaser's income. See Associated Patentees, Inc., 4 T.C. 979 (1945). On an annual basis, the purchaser's cost for the use of the alleys is readily *73 ascertainable. Any initial payment applicable to more than a single year should be amortized over the useful life of the property, with respect to which there is no dispute. The additional liability of the purchaser each year, so long as the purchaser continues to use the property, should be amortized or deducted as a cost of operations in the year incurred and paid. Only in this manner will the annual deduction constitute a reasonable allowance for depreciation as provided in section 167. Albany Car Wheel Co., supra; Associated Patentees, Inc., supra.[6]
II. New Riverview Stock On June 15, 1958, the petitioner owned 300 shares of New Riverview, a New Jersey corporation organized *74 for the purpose of operating garden apartments in Jersey City, New Jersey. In 1955, 1956, 1957, and 1958, dividends were distributed out of capital surplus. Such distribution was treated as a return of capital, and by 1958 such treatment had resulted in the reduction of the petitioner's basis in the stock to zero. Thereafter, the petitioner purported to sell 100 shares of the New Riverview stock to each of those trusts for the benefit of his three sons. On or about June 16, 1958, petitioner executed an agreement to purchase the remaining 950 outstanding shares of New Riverview stock from the other stockholders at $1,160 per share. As of January, 1959, the petitioner was the owner of record of 1,250 shares of New Riverview, said shares being all of its outstanding shares. In his deficiency notice, the respondent determined that the corporation was liquidated in 1959 at a time when the petitioner owned all of the shares. Accordingly, the respondent has determined that the petitioner received the assets of the corporation upon its liquidation and has required the reporting of the entire amount of gain in that year. At the same time, the respondent determined that petitioner improperly *75 reported only part of the gain in 1959 and subsequently improperly reported additional gain in 1961. The petitioner contends that in 1958, petitioner sold to three trusts established and existing for the benefit of John B. Marcus, Peter M. Marcus, and Richard M. Marcus, sons of the petitioner, 300 shares of New Riverview stock at a price of $1,120 per share for a total consideration of $363,000. The petitioner insists that the trusts were duly constituted trusts with an independent trustee, and that the sale of stock to the trusts was bona fide and at arm's length. Petitioner further contends that his sale of the 300 shares of stock in 1958 was in accordance with an installment contract from which he received the following amounts: Year
Amount
1958
$ 0
1959
81,000.00
1960
9,000.00
1961
95,571.18
Upon the basis of the record before us, the Court is unable to find that there was, 1275 in fact, a sale of said 300 shares of New Riverview stock to the trusts. Even assuming, however, that the said stock was sold and reacquired by the petitioner, the petitioner is not entitled to report any resulting gain on the installment basis. In his brief, the petitioner *76 admits that he did not make an election to report the sale of the 300 shares of an installment sale in his 1958 return. However, he claims to have made an offer on several occasions to a revenue agent to file an amended return. Citing Bookwalter v. Mayer, 345 F. 2d 476 (C.A. 8, 1965), petitioner contends that such an offer constitutes a valid election to report the sale of stock on the installment method. Under certain circumstances, an offer to file an amended return is sufficient to constitute a valid election for installment sale treatment. Bookwalter v. Mayer, supra. In this case, however the petitioner has not introduced any evidence that he made such an offer. In that regard, he has made only unsupported contentions in his brief. Hence, the petitioner has failed to submit any evidence which would demonstrate error in the respondent's determination on this issue, and we must therefore decide in favor of the respondent. Cf. David Courtney, 28 T.C. 658 (1957). III. Travel and Entertainment Expenses *77 The burden of proof is upon the petitioner to demonstrate error in the respondent's determination with respect to these expenses; and, since the petitioner has presented no evidence to demonstrate that this determination by the respondent is incorrect, we sustain the respondent. Cf. David Courtney, supra. IV. Loss on Rental Property The petitioner has failed to introduce any evidence which could overcome the presumptive correctness of the respondent's determination with respect to this issue, and we must therefore sustain the respondent. Cf. David Courtney, supra.
Decision will be entered under Rule 50. Footnotes
1. Petitioner Muriel B. Marcus is a party to this proceeding solely by reason of having filed a joint return with petitioner Leonard Marcus for the taxable years in question herein.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.↩
3. SEC. 167. DEPRECIATION. * * * (g) BASIS FOR DEPRECIATION. - The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 1011↩ for the purpose of determining the gain on the sale or other disposition of such property.
4. SEC. 1011. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) General Rule. - The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis (determined under section 1012 or other applicable sections of this subchapter and subchapters C (relating to corporate distributions and adjustments), K (relating to partners and partnerships), and P (relating to capital gains and losses)), adjusted as provided in section 1016↩. * * * 5. SEC. 1012-1. BASIS OF PROPERTY. (a) General Rule. - In general, the basis of property is the cost thereof. The cost is the amount paid for such property in cash or other property. * * *↩
6. Since both the petitioner and the respondent have treated the transactions pursuant to which the so-called "purchasers" acquired the bowling alley establishments as a "purchase" of the property, the Court has not been called upon to decide whether the transaction might be regarded, in substance, as a rental of the alleys. See Meiselman v. Commissioner, 300 F. 2d 666↩ (C.A. 4, 1962).