**BLACKSTONE REALTY COMPANY,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 24381.

United States Court of Appeals

Fifth Circuit.

July 12, 1968.

Roland J. Mestayer, Jr., Pascagoula, Miss., for petitioner.

Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Atty., Lester R. Uretz, Chief Counsel, Charles Owen Johnson, David O. Walter, Robert J. Campbell, Attys., Washington, D. C., for respondent.

Before COLEMAN and GOLDBERG, Circuit Judges, and HANNAY, District Judge.

GOLDBERG, Circuit Judge:

This appeal presents the question of whether the Commissioner of Internal Revenue is bound by a taxpayer's unilateral valuations of the component parts of a sale. The taxpayer, having sold a leasehold and appurtenant improvements to a buyer concerned only with the aggregate price, seeks to establish its own fragmented valuations in order to receive the tax benefits granted to installment sales through Section 453 of the Code. The Commissioner and the Tax Court rejected such valuations and refused to allow the tax benefits. We affirm.

The factual nature of this case compels us to approach the ultimate contract of sale through a smidgen of transactional history. On April 5, 1949, Manuel Vellianitis leased a four-story building known as the Greystone Building,[1] located in the downtown commercial district of Mobile, Alabama. The lease was to run for a continuous term from November 1, 1949, to October 31, 1960, with provisions granting the lessee the option to renew the lease for two additional ten-year terms.

The upper three floors of the Greystone Building were not air-conditioned. Vellianitis believed that an air-conditioning apparatus should be installed prior to any efforts to sublease or sell his interest in the premises, and on February 17, 1950, he entered into an agreement with the lessor whereby the latter agreed to install air-conditioning equipment in return for a specific monthly compensation. The agreement also provided that upon receipt of the final payment, which was due on the same day as the termination date of the original lease, title to part of the equipment would pass from the lessor to the lessee.

In 1958 Vellianitis and his wife, Penelope, organized the taxpayer, Blackstone Realty Company, to manage and operate their real estate investments. Vellianitis assigned to Blackstone Realty his leasehold in the Greystone Building in exchange for all of the outstanding stock in the corporation.

A new lease for the Greystone Building was signed soon after the creation of the company. This document superseded the original lease and its supplement. As part of the negotiated lease agreement, Blackstone Realty became obligated to make and pay for certain repairs and improvements to the premises.[2] In order to pay for the repairs and improvements, the lessor agreed to lend Blackstone Realty $25,000. This entire sum plus additional funds of Blackstone Realty were spent remodeling the building.

In 1959 Blackstone Realty employed a real estate broker to find a purchaser for its leasehold interest in the Greystone Building and whatever interest it had in the leasehold improvements. The

---

1. The briefs also refer to the structure as the Meaher Building, after Augustine Meaher, whose estate held title to it.

2. The new lease covered a ten-year term with four ten-year options to renew. The improvements included a new elevator, new electrical wiring, plastering, and redecorating. The redecorating entailed the installation of wood paneling and some light fixtures.

broker contacted D. R. Coley, Jr., an attorney, who was the chairman of the board of directors of the First Federal Savings and Loan Association of Mobile, Alabama. Coley expressed interest in the building, and the parties began negotiations for a sale. During the negotiations Blackstone Realty insisted upon separate consideration for the leasehold and the improvements. After several proposals and counter-proposals, Blackstone Realty accepted the bank's conditional offer of March 15, 1960, which provided in part:

> $100,000 cash to be allocated to the cost of fixtures, equipment, air-conditioning, elevator, etc., installed by Blackstone Realty Company, Inc., in the building;
>
> $1,000 per month for a period of twenty years, or a total of 240 months, the first payment to be due and payable thirty days from the closing of the transaction.

This deal was never consummated because the bank was unable to reach agreement with the lessor to extend the lease to ninety-nine years, a necessary condition of the offer.

On July 1, 1960, the lessor reconsidered and agreed to the extension. The bank and the taxpayer then executed a new "lease and agreement" whereby Blackstone Realty assigned all of its rights in the Greystone Building to First Federal. The consideration was the same in amount and terms of payment as contained in the bank's offer of March 15, 1960: $340,000 total, $100,000 in cash and $1,000 per month for 240 months. No specific reference, however, was made to the distinct separation of monies allocated for payment of the leasehold and the improvements.[3]

First Federal paid Blackstone Realty $100,000 in cash in Blackstone's taxable year ending May 31, 1961, and during such year also paid the company ten $1,000 monthly payments. From the proceeds the lessor was then paid the remaining balance of the amount which it had advanced for the making of improvements to the leasehold premises.

First Federal found that the building could be adequately remodeled, and that it would be necessary to do so for the purposes which it contemplated for the building. It installed a different type of air-conditioning and did not use the air-conditioning units which had been installed previously by Vellianitis. Nor did it use in the building the window

3. The lease of July 1, 1960, made no reference to the offer of March 15, 1960. It provided in pertinent part as follows:

Whereas, the Party of the First Part has made certain improvements on the said leased property and owns certain fixtures and equipment situated thereon and used in connection therewith; and

Whereas, Party of the Second Part desires to acquire all of the rights and interests of the Party of the First Part in and to said property under said lease, and all rights and privileges granted to the Party of the First Part under the provisions of said lease, and desires to acquire the fixtures and equipment owned by the Party of the First Part in connection therewith as aforesaid;

Now Therefore, in consideration of the premises and of the sum of One Hundred Thousand Dollars ($100,000) in cash, the receipt whereof is hereby acknowledged, and in further consideration of the payment by the Party of the Second Part to the Party of the First Part of the sum of One Thousand Dollars ($1,000) per month for a total of two hundred and forty consecutive months, beginning on the 1st day of August, 1960, without interest, and further consideration of the assumption by the Party of the Second Part of all duties and obligations imposed upon the Party of the First Part by the terms of the lease aforesaid. * * *. The Party of the First Part has and does by these presents Sell, Assign, Transfer and Set-Over and Convey unto the Party of the Second Part all of the certain personal property owned by the Party of the First Part, located on and/or used in connection with the operation of the premises, and all of its right, title and interest in and to that certain lease * * * and to the real property described therein, including all rights of renewal and every other right or privilege in it which it has by virtue of said lease or otherwise.

units which Vellianitis had installed. It did use a considerable portion of the paneling which had been installed previously by Vellianitis.

On its books First Federal set up the $100,000 cash payment as an asset, prepaid lease expense, and amortized it over a 47½-year period. It treated the $1,000 monthly payments as rentals. It did not set up on its books any account with respect to any fixtures or improvements obtained under the agreement of July 1, 1960.

In contrast, Blackstone Realty, in its income tax return for the taxable year ending May 31, 1961, treated the $100,000 cash payment as proceeds solely from the sale of "leasehold improvements." Valuing the improvements at an adjusted basis of $56,007.33, and allocating $1,286.77 of the total commission expense to the sale of improvements, it reported a gain of $42,705.90. It treated the balance of the selling price as proceeds from the sale of a leasehold, reporting a gain of $236,786.77.[4] Blackstone Realty elected to report the sale of the leasehold on the installment method by utilizing Section 453 of the Internal Revenue Code,[5] and it reported as a long-term capital gain $9,866.11 of the $10,000.00 actually received in monthly rentals during the taxable year. The 1961 return thus showed a taxable gain on the sale of the lease of $52,572.01 ($42,705.90 + $9,866.11).

The tax return filed by Blackstone Realty was rejected by the Commissioner as not reflective of the true nature of the sale. In a Notice of Deficiency the Commissioner treated the sale in the aggregate, combining the gain from the leasehold and improvements and placing them within the one-year period. The Commissioner thus determined that the transaction with First Federal had resulted in the receipt by Blackstone Realty of a single long-term gain of $204,671.56 in the taxable year ending May 31, 1961, a transaction which, under the 30% rule of Section 453, could not be reported on the installment basis. This determination resulted in an increase of $152,099.55 in taxable income over what had been reported and a tax deficiency of $43,684.93.

---

4. This figure was computed in the following manner:

$240,000.00 Payment allocated to the leasehold
—3,088.23 Portion of commission allocated to leasehold
—125.00 Inspection fee
_____
$236,786.77 Gain

5. Section 453 of the Code provides in part as follows:
"Section 453. INSTALLMENT METHOD
(a) Dealers in personal property.—
(1) In general.—Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.
(2) * * *
(b) Sales of realty and casual sales of personalty.—
(1) General Rule.—Income from—
(A) a sale or other disposition of real property, or
(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a).
(2) Limitation.—Paragraph (1) shall apply—
(A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after the date of enactment of this title), only if in the taxable year of the sale or other disposition—
(i) there are no payments, or
(ii) the payments (exclusive of evidence of indebtedness of the purchaser) *do not exceed 30 percent of the selling price."*
(Emphasis added.)

Blackstone Realty appealed the determination of the Commissioner to the Tax Court. The Tax Court, however, held that Blackstone Realty had an affirmative duty to establish the true selling price of the improvements in order to come within Section 453. It found that the valuation urged by Blackstone Realty did not portray the veritable value of the improvements and that the taxpayer's failure to offer any other evidence as to value precluded it from benefit of the 30% rule.

■ The installment provision of Section 453 affords the taxpayer the privilege of recording gain in a reasonable relation to profit actually made during an accounting period. For a taxpayer to avail himself of this privilege, however, he must comply with certain specific requirements. One such requirement is the 30% rule in subsection (b) (2) (A) (ii), that "payments * * * do not exceed 30 percent of the selling price." This 30% rule has an "all or nothing" application: If the payments received during the taxable year of the sale do not exceed 30% of the selling price, they may be reported by the installment method; if they do exceed 30%, the taxpayer may not avail himself of the installment sale tax deferment.

The clear mandate of Section 453 that no more than 30% of the selling price be received in the taxable year logically necessitates an accounting procedure which correctly and precisely records the realities of the transaction. Blackstone Realty does not contest the validity of this proposition, but rather argues that there were two sales and that the values placed upon the leasehold and the improvements were representative of actual worth. Since they were based upon arm's length negotiation, it claims, no additional proof of actual values was necessary.

To the contrary, all the available evidence in the record indicates that the claimed "arm's length" allocation of the $100,000 does not even approach a realistic, accurate valuation. The adjusted basis of the leasehold improvements on the books of Blackstone Realty was only $56,007.33; moreover, at least three factors found by the Tax Court indicate that the fair market value of the improvements was much less than the adjusted basis. First, the sum of $56,007.-33 apparently includes Blackstone Realty's computed basis in improvements which it did not own. The elevator improvements, for example, though installed in 1954 at Blackstone Realty's expense (more than $25,000), by express contract remained the property of the lessor. Likewise, all of the central air-conditioning system which had been installed by Vellianitis in 1950 had remained the property of the lessor except three compressor units.[6]

Second, the negotiations between Blackstone Realty and First Federal show an undisputable lack of interest on the part of the latter in the improvements. The Tax Court's analysis of this factor is quite complete, and we will add only an excerpt from the testimony of Mr. Coley who represented First Federal in the negotiations of sale:

"Q. Mr. Coley, did you, in behalf of First Federal Savings have any appraisal made as to the value of whatever property interest Mr. Vellianitis might have had in the improvements?

A. I did not.

Q. Were you interested in what value he might put on it, what value

6. The Tax Court assumed arguendo that the contract of sale between Blackstone Realty and First Federal included the three compressors and the twenty to twenty-five window air-conditioning units. That Court also assumed that the wood paneling and light fixtures had been the property of Blackstone Realty, despite a serious question in that regard under the Alabama law. We mention these examples to show both the fairness in the Tax Court's approach and the complete failure of Blackstone Realty to present its case.

he might put on these improvements? [objection made and overruled]

A. I think that I stated that I was not concerned with the improvements.

Q. I believe you have testified earlier that you were concerned with the lease.

A. With the lease. But I had to trade on everything or nothing."

Finally, First Federal's extensive remodeling, discussed supra, renders suspect any notions that it may have silently coveted the leasehold improvements.[7]

 It is fundamental tax law that the burden of proof is on the taxpayer to show that the Commissioner's determination was invalid. Helvering v. Taylor, 1935, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623; Webb v. Commissioner of Internal Revenue, 5 Cir. 1968, 394 F.2d 366, [April 23, 1968] (and authority cited therein). The Tax Court's approval of that determination will not be set aside by this Court unless clearly erroneous. 26 U.S.C. § 7482(a) (placing Tax Court decisions within the realm of Rule 52 (a)). Blackstone Realty falls far short in attempting to convince us that its improvements were sold for $100,000, $56,007.33, or even $11,500, the minimum value required for Blackstone Realty to meet the 30% test.[8] In order to sustain Blackstone Realty's fragmentation of the sale price into payment for the leasehold on the one hand and improvements on the other, we must consider ourselves bound by a unilateral and unsubstantiated declaration of value or consideration by the taxpayer. (Moreover, this value is to be found only in a pre-contract offer, not even in the contract itself.) Our income tax law is premised on fact and not fiction. A transaction is analyzed for its pragmatic realities. Although a taxpayer is free to negotiate a contract with an intent to avoid or minimize taxes, such benefit cannot be awarded to Blackstone Realty in the absence of negotiations for prices and values. The intention to avoid or minimize taxes, beneficient as it is, cannot be employed where the end product is a mere subterfuge. Martin v. Commissioner of Internal Revenue, 6 Cir. 1967, 379 F.2d 282; MacRae v. Commissioner of Internal Revenue, 9 Cir. 1961,

---

7. In fact, there is strong evidence to the contrary in the following testimony by Mr. Coley:

"Q. All right, sir. From the outset, were you interested in the building as a building, or in the location?
[objection made and overruled]
A. What we desired was the location, and the building, if we could use it.
Q. Did you have in mind possibly remodeling the building, or tearing it down completely?
A. We had in mind possibly tearing it down if we could not remodel it economically. We decided that we could repair it, and so that is what we did.
Q. Was this still—excuse me—was this still in your plans as of the day you entered into the sales agreement on July 1, 1960?
[objection made and overruled]
A. Well, my recollection is that we had continued with that. We decided one time that we couldn't remodel it; and then we decided that we could remodel it. My recollection is that we had never decided definitely that we couldn't do it. In fact, we didn't.

Q. You didn't tear the building down?
A. No, sir.
Q. Was it remodeled?
A. Yes, sir. It was extensively remodeled."

8. If the entire consideration is allocated to the lease, it is obvious that Blackstone Realty did not come within the 30% rule.
$340,000 x 30% = $102,000 maximum cash allowable
The taxpayer, having accepted $110,000 in the taxable year thus received $8,000 too much. But if $8,000 were allocated to the improvements, this still would not be enough because the price of the leasehold would also be reduced by $8,000.
$332,000 x 30% = $99,600 maximum cash allowable
$110,000 − $8,000 = $102,000 cash received
In round figures the taxpayer would have to show the fair market value of the improvements to be $11,500 to prevail:
$328,500 x 30% = $98,550 maximum cash allowable
$110,000 − $11,500 = $98,500 cash received.

294 F.2d 56, cert. den., 1962, 368 U.S. 955, 82 S.Ct. 398, 7 L.Ed.2d 388; Trousdale v. Commissioner of Internal Revenue, 9 Cir. 1955, 219 F.2d 563. Cf. Reef Corporation v. Commissioner of Internal Revenue, 5 Cir. 1966, 368 F.2d 125, cert. den., 1967, 386 U.S. 1018, 87 S.Ct. 1371, 18 L.Ed.2d 454; General Guaranty Mortgage Co., Inc. v. Tomlinson, 5 Cir. 1964, 335 F.2d 518.

The Ninth Circuit, in Particelli v. Commissioner of Internal Revenue, 9 Cir. 1954, 212 F.2d 498, reviewing a situation analogous to our own, looked past illusory paper valuations. We quote from that opinion:

"It is recognized that a taxpayer is free to employ any legal means in the conduct of his business affairs to avoid or minimize taxes, but the means employed must not be mere subterfuge or sham. Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Nordling v. Commissioner of Internal Revenue, 9 Cir. 1948, 166 F.2d 703, certiorari denied 335 U.S. 817, 69 S.Ct. 38, 93 L.Ed. 372.

"The determination of whether the written contract reflected the real agreement between the parties was a question of fact and the Tax Court's finding with respect thereto is final if based upon substantial evidence. Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670. We find substantial evidence in this case to support the Tax Court's conclusion that the substance of the transaction was a sale of the wine and winery for a total price of $350,000 without any bona fide agreement as to the real sales price of each piece of property involved.

\* \* \* \* \* \*

The total purchase price was arrived at through arms length negotiation but the allocation of the selling price to the two pieces of property involved was not. Once the parties had agreed upon the purchase price it was a matter of indifference to the buyer as to how the seller allocated it. The argument that the valuation placed on the wine and the winery was of vital importance to Tiara because it necessarily affected its income tax position has no merit. that argument wholly ignores the crucial fact that the federal income tax is a graduated tax and a given transaction may have different consequences depending upon the circumstances of the particular taxpayer." 212 F.2d at 500–501.

See also Tombari v. Commissioner of Internal Revenue, 9 Cir. 1962, 299 F.2d 889, 892; Hamlin's Trust v. Commissioner of Internal Revenue, 10 Cir. 1954, 209 F.2d 761; Cf. F & D Rentals, Inc. v. Commissioner of Internal Revenue, 7 Cir. 1966, 365 F.2d 34, 40, cert. den., 385 U.S. 1004, 87 S.Ct. 707, 17 L.Ed.2d 543; Kunz v. Commissioner of Internal Revenue, 6 Cir. 1964, 333 F.2d 456, 557; Meiselman v. Commissioner of Internal Revenue, 4 Cir. 1962, 300 F.2d 666, 668.

■ A self-serving allocation of values must have some factual texture rather than mere embroidery. Although Blackstone Realty insisted upon separate consideration throughout the negotiations, the record substantiates the Tax Court's finding that First Federal was concerned only with the sum of the components rather than the quantum of each integer. The sale of the assets and lease was a unity in fact and is not to be fissioned arbitrarily for tax savings.

■ Even contractual allocations are not sacrosanct and beyond the pale of Commissioner inquiry and determination. Those parts of a transaction that the parties join, no taxpayer may put asunder.

Affirmed.