PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/10/99
THOMAS  K. KAHN
CLERK

----------------------
No. 98-2872
----------------------
Tax Court No. 12663-95

ELI T. SLEIMAN, JR., and JANIE L. SLEIMAN,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

----------------------
No. 98-2873
----------------------
Tax Court No. 12664-95

PETER D. SLEIMAN and CAROLINA T. SLEIMAN,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

ANTHONY T. SLEIMAN and BONNIE C. SLEIMAN,

Petitioners-Appellants,

versus

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

-----------------------
Appeals from a Decision of
the United States Tax Court
-------------------------
**(September 10, 1999)**

Before BARKETT, Circuit Judge, KRAVITCH and MAGILL[*], Senior Circuit Judges.

KRAVITCH, Senior Circuit Judge:

    Eli, Janie, Peter, Carolina, Anthony, and Bonnie Sleiman[1] (together,

---

[*]Honorable Frank J. Magill, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]Appellants are three brothers, who are real estate developers in Florida, and their wives. Although the wives—Janie, Carolina, and Bonnie—are parties to the cases before us because they

"appellants") appeal three orders of the United States Tax Court denying their petitions to redetermine their tax liability for the years 1991 and 1992. Their consolidated appeals require us to decide two issues: whether the tax court erred in determining that Eli and Peter could not increase their adjusted bases in S corporations they owned by the amount of loans to the corporations that they personally had guaranteed, and whether the tax court properly upheld the Commissioner of Internal Revenue ("Commissioner")'s reallocation of Anthony's basis in a piece of real property.

## I. FACTS AND PROCEEDINGS BELOW

### A.    Eli's and Peter's Guaranteed Loans

#### 1.    Eli and REE

Eli entered into a lease agreement with Blockbuster Video, Inc. ("Blockbuster") in July 1991, in which he agreed to purchase land on Dunn Avenue in Jacksonville, Florida (the "Dunn property"), build a video rental store, and lease it to Blockbuster. The lease agreement provided that if the property was environmentally contaminated, Blockbuster could terminate the lease. On August 21, 1991, Eli formed an S

---

filed joint tax returns with their husbands, the husbands were the primary participants in the transactions that are at issue in this appeal. For simplicity, we therefore refer to the parties using only the first names of the husbands—Eli, Peter, and Anthony.

corporation,[2] Real Estate Equities, Inc. ("REE"), and assigned his rights under the lease to REE. REE subsequently purchased the Dunn property; it owned no assets other than that property. The Dunn property, the former site of a gas station, was environmentally contaminated and required substantial cleanup. Because Florida's Early Detection Initiative ("EDI") program covered the property, the state agreed to cover the costs of environmental remediation. REE completed the environmental cleanup in 1994.

Eli presented evidence that because of the environmental contamination and REE's lack of long-term financing or liquid assets, REE experienced some difficulty in getting a construction loan. REE eventually secured a 1-year, $450,000 loan from SouthTrust Bank of Alabama, N.A. ("SouthTrust") in October 1991. The mortgage note required REE to make monthly interest payments and pay the principal amount on October 23, 1992. To secure the loan, REE pledged the Dunn property, its improvements, and REE's interest in the Blockbuster lease.[3] Although the EDI program would cover the costs of environmental cleanup, REE agreed to indemnify SouthTrust against any additional liability arising from the environmental

---

[2]Subchapter S of the I.R.C., 26 U.S.C. § 1361 et seq., governs S corporations.

[3]An independent appraiser valued the Dunn property, with the Blockbuster lease, at $870,000.

contamination. In addition, Eli personally guaranteed both the mortgage note and REE's commitment to indemnify SouthTrust for any environmental liability. Although Eli did not pledge any of his assets, he promised to refrain from transferring or pledging any of them for less than full and adequate consideration without SouthTrust's consent. SouthTrust never called on Eli's personal guarantee.

A second SouthTrust loan to REE, a ten-year, $450,000 loan made on December 21, 1992 and retroactively effective on the date the construction loan expired, had a similar structure. Like the first loan, the second loan was secured by a mortgage on the property and REE's interest in the Blockbuster lease and by Eli's personal guarantee. SouthTrust's internal credit report showed that REE's cash flow from the Blockbuster lease would be approximately twice the monthly loan payments and that an independent appraiser had valued the Dunn property with the Blockbuster lease at roughly twice the principal amount of the loan. REE reported both loans in its books as liabilities owed to SouthTrust, not capital contributions from Eli. At the time of trial, REE had made all its payments on the SouthTrust loans, and SouthTrust had not called on Eli's personal guarantee.

Eli received $55,400 in distributions from REE in 1992. On his 1992 tax return, he claimed that none of this money constituted taxable capital gains because his adjusted basis in REE included the amount of the SouthTrust loans that he had

5

personally guaranteed. The Commissioner disagreed and issued a Notice of Deficiency.

### 2. Peter and TNE

Peter's transactions with his S corporation, Triple Net Equities, Inc. ("TNE"), resembled those between Eli and REE. Peter entered into a lease agreement with Blockbuster in March 1991, agreeing to purchase land on Roosevelt Boulevard in Jacksonville (the "Roosevelt property"), build a video rental store, and lease it to Blockbuster. Like the Dunn property, the Roosevelt property was an environmentally contaminated former gas station that had been accepted into Florida's EDI program.[4] In August 1991, Eli incorporated TNE, later assigning the Blockbuster lease to it. Like REE's Blockbuster lease agreement, TNE's Blockbuster lease agreement provided that if the property was environmentally contaminated, Blockbuster could terminate the lease. TNE subsequently purchased the Roosevelt property; the property was the corporation's only asset.

Peter testified that TNE was unable to secure a traditional bank loan because the property was contaminated. TNE therefore financed the purchase and construction

---

[4]The Roosevelt property apparently was more contaminated than the Dunn property. Its contamination had spread to neighboring properties, which contained occupied residences, and it remained contaminated at the time of the trial, in 1997. The EDI program would not cover any cleanup costs or other liabilities resulting from the contamination of the adjoining properties.

costs of the Roosevelt property with loans from Peter's other businesses. In order to pay off these loans, TNE borrowed $450,000 from SouthTrust on October 2, 1992. As security for the loan, TNE pledged the Roosevelt property and its improvements, TNE's interest in the Blockbuster lease, and TNE's right to participate in Florida's EDI program. Although the EDI program would cover the costs of environmental cleanup, TNE agreed to indemnify SouthTrust against any additional liability arising from the environmental contamination. In addition, Peter personally guaranteed the loan.[5] Although Peter did not pledge any of his assets, he promised to refrain from transferring or pledging any of his assets for less than full and adequate consideration without SouthTrust's consent. SouthTrust's internal credit report showed that it expected TNE's cash flow from the Blockbuster lease to be more than one and one-half times the monthly payments on the loan and that it valued the Roosevelt property, with the Blockbuster lease, at roughly twice the principal amount of the loan. Like REE, TNE reported the loan in its books as a liability owed to SouthTrust, not as a capital contribution from Peter. At the time of trial, TNE had made all its payments on the SouthTrust loan, and SouthTrust had not called on Peter's personal guarantee.

---

[5]Peter, like Eli, submitted statements of financial position to SouthTrust showing that he had a net worth of over $8 million.

In 1992, Peter received $119,397 in distributions from TNE. Like Eli, in his 1992 tax return, he claimed that none of this money constituted capital gains because his adjusted basis in TNE included the amount of the SouthTrust loan that he had personally guaranteed. The Commissioner disagreed and issued a Notice of Deficiency.

B.    Anthony's Allocation of Acquisition Cost

During 1991 and 1992, Anthony was the sole shareholder of Miramar Equities, Inc. ("ME"), an S corporation. ME purchased the Miramar Shopping Center ("Shopping Center") from Country, Inc. in July 1992. The purchase and sale agreement allocated $60,000 of the $745,000 purchase price to land. On ME's 1992 income tax return, it used this $60,000 valuation to establish its depreciation deduction.[6] The Commissioner disagreed, determining that ME should have allocated $377,735 of the purchase price to land. It therefore disallowed a portion of ME's claimed depreciation deduction and issued a Notice of Deficiency.

C.    Proceedings Below

Appellants filed petitions in the United States Tax Court in July 1995, challenging the Commissioner's Notices of Deficiency regarding their 1991 and 1992

---

[6]ME determined its depreciable basis in the Shopping Center by subtracting the $60,000 allocated to the land from its total basis in the property. Land generally cannot be depreciated. See Keefer v. Commissioner, 63 T.C. 596, 599 (T.C. 1975).

tax returns. After the parties stipulated to a number of facts, the consolidated cases went to trial in 1997. The tax court issued a Memorandum Opinion in November 1997. With regard to the guaranteed loans to REE and TNE, the tax court held that Eli and Peter could not treat their personal guarantees of the SouthTrust loans as capital contributions that increased their adjusted bases in the S corporations.

The parties presented no testimony at trial regarding the allocation of basis to the land and buildings that ME had purchased. Anthony introduced into evidence the purchase and sale agreement showing that ME and Country, Inc., the seller, had allocated $60,000 of the purchase price to land and $685,000 to buildings. The parties stipulated to two other appraisals made before and after ME purchased the Shopping Center, each of which assigned a value of more than $500,000 to the land. The tax court held that appellants had not met their burden of proving that the Commissioner's reallocation of their basis was incorrect. The only evidence appellants had offered of ME's proposed allocation was the purchase and sale agreement, and the court found that this document was not determinative. The court therefore upheld the Commissioner's reallocation.

## II. THE GUARANTEED LOANS

Operating a small business as an S corporation has certain tax consequences. The corporation is not subject to the corporate income tax; instead, its profits and

losses "pass through" to its shareholders' personal income tax returns. See 26 U.S.C. § 1366. When an S corporation with no accumulated earnings or profits makes a distribution to a shareholder, the shareholder must recognize capital gain only on that portion of the distribution that exceeds her adjusted basis in the shares of the S corporation's stock. See 26 U.S.C. § 1368(b). The shareholder's adjusted basis in the stock is increased by amounts the shareholder contributes to the S corporation's capital. See 26 U.S.C. § 1367; 26 C.F.R. § 1.118-1. The more money a shareholder puts into the S corporation, the higher her adjusted basis; the higher her adjusted basis, the less capital gain she realizes if the S corporation makes a distribution to her; the less capital gain she realizes, the lower her potential tax liability.

Eli and Peter claim that they were entitled to include the amount of the loans in their bases in the S corporations under the holding of Selfe v. United States, 778 F.2d 769 (11th Cir. 1985).[7] In Selfe, the taxpayer established a line of credit for her retail clothing business in her own name, secured by stock that she and her family owned. Soon afterwards, she incorporated the business as an S corporation. At the bank's request, she converted her personal loans to corporate loans; she executed a personal guarantee, however, and the bank retained its security interest in the pledged

---

[7]We discuss Eli's and Peter's transactions together because they were substantially the same in all aspects relevant to our analysis.

10

stock.  See id. at 770-71.  Although the corporation consistently operated at a loss, it never defaulted on the loan and Selfe never personally paid off any of the loan.  See id. at 771.  Selfe, who wished to recognize the corporation's entire loss on her personal tax return, contended that the Commission should have treated the transaction as a loan from the bank to her, followed by a capital contribution by her to the S corporation, resulting in an increase in her adjusted basis.  The district court disagreed and granted summary judgment in the government's favor.

In Selfe, we held that a shareholder in an S corporation who personally guarantees a debt of the corporation may increase her basis in the corporation by the amount of the debt "where the facts demonstrate that, in substance, the shareholder has borrowed funds and subsequently advanced them to her corporation."  Id. at 773.[8] We noted the general rule that an "economic outlay is required before a stockholder in a Subchapter S corporation may increase her basis."  778 F.2d at 772.  We stated, however, that this rule does not require "a stockholder/taxpayer [to], in all cases, absolve a corporation's debt before she may recognize an increased basis as a guarantor of a loan to a corporation."  Id.  Noting that "where the nature of a

---

[8]Several other circuits have taken a different view, holding that a shareholder's guarantee of a loan made to her S corporation cannot increase the shareholder's basis unless the shareholder has made payment on the loan pursuant to the guarantee.  See, e.g., Uri v. Commissioner, 949 F.2d 371, 373-74 (10th Cir. 1991); Estate of Leavitt v. Commissioner, 875 F.2d 420, 422 (4th Cir. 1989); Brown v. Commissioner, 706 F.2d 755, 756-57 (6th Cir. 1983).

taxpayer's interest in a corporation is in issue, courts may look beyond the form of the interest and investigate the substance of the transaction," id. at 774, and citing Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712 (5th Cir. 1972), we held that a shareholder's guarantee of a loan to an S corporation "may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor," Selfe, 778 F.2d at 774. We concluded that issues of material fact remained and remanded so that the district court could make factual findings on the issue of "whether or not the bank primarily looked to [the taxpayer] for repayment" in order to determine "if the bank loan . . . was in reality a loan to the taxpayer." Id. at 775.[9]

The tax court in the case before us distinguished Selfe, finding that the SouthTrust loans to TNE and REE were not the same, in substance, as loans to Eli and

---

[9]We also instructed the trial "court to apply the factors set out in In re Lane[,742 F.2d 1311, 1314-15 (11th Cir. 1984)] and [26 U.S.C. §] 385 to determine if the taxpayer's guarantee amounted to either an equity investment in or shareholder loan to [the S corporation]." Selfe, 778 F.2d at 775. In re Lane and section 385 set out thirteen and five factors, respectively, that aid courts in determining whether a stockholder's advances to a corporation constitute debt or equity. If a court analyzing a shareholder guarantee of a loan determines that the loan was not in substance a loan to the shareholder because the lender did not "look[] to the shareholder as the primary obligor," Selfe, 778 F.2d at 774, as we do here, it is not necessary to proceed to the second part of the Selfe inquiry and determine whether the shareholder's subsequent advance to the corporation constituted an equity investment or a loan. See id. at 775; see also Estate of Leavitt v. Commissioner, 875 F.2d 420, 426-27 (4th Cir. 1989) (interpreting the Selfe inquiry as a two-step test, and finding it unnecessary to apply debt-equity principles to determine nature of taxpayer's advance to corporation once it determined that taxpayer had not prevailed on first step).

12

Peter followed by capital contributions to the S corporations.[10] It therefore held that Eli and Peter could not increase their bases in the corporations by the amounts of the loans. We review de novo the tax court's holding that Eli's and Peter's guarantees of the loans could not be treated as contributions by them to the S corporations, because this conclusion stemmed from the application of legal principles to subsidiary facts. See Estate of Wallace v. Commissioner, 965 F.2d 1038, 1044 (11th Cir. 1992) ("[T]he Tax Court's rulings on the interpretation and application of the statute are conclusions of law subject to de novo review . . . and the tax court's findings of ultimate fact which result from the application of legal principles to subsidiary facts are subject to de novo review.") (internal quotations, citations, and punctuation omitted). We review the tax court's other findings of fact for clear error. See id.

Relying on the facts that REE and TNE provided valuable collateral for the loans and that the corporations had "ample cash-flow to service the loans,"[11] the tax court concluded that the loans did not "lack economic substance."[12] Although the tax court did not use the language of Selfe, its reasoning shows that its conclusion that the loans had "economic substance" was equivalent to a finding that SouthTrust looked

[10]See Mem. Op., R-98-2872-28 at 12-15.

[11]Mem. Op., R-98-2872-28 at 13.

[12]Id. at 12.

13

to the corporations as the primary obligors on the loans. This finding was not clearly erroneous.

The government presented ample evidence that SouthTrust looked to REE and TNE for repayment of the loans. SouthTrust originally made the loans to REE and TNE, not to Eli and Peter, and Eli and Peter never pledged any of their personal assets to secure the loans. These facts distinguish the case before us from Selfe, in which the bank originally loaned money to the taxpayer, then, after the taxpayer had formed her S corporation, asked the taxpayer to transfer the loans to the corporation. The Selfe taxpayer also pledged her personal stock to secure the loan.

The record shows that SouthTrust viewed REE and TNE as secure business concerns that were likely to repay their loans. SouthTrust's appraisals estimated that the collateral (including the real property, buildings and leases) of each was worth nearly twice the amount of the loans. SouthTrust's internal credit reports stated that the cash flow from the leases would be significantly higher than the debt payments to SouthTrust. A SouthTrust report on TNE stated that the loan had "[s]trong collateral coverage"[13] and that "the Sleiman's [sic] . . . represent a viable secondary repayment source."[14] SouthTrust also appeared to have gained confidence in REE's and TNE's

---

[13]SouthTrust Credit Offering Report, R-98-2873 Ex. 32-AF at 4.

[14]Id. at 6 (emphasis added).

14

prospects from the Sleiman brothers' track record of creating successful real estate ventures; one credit report noted that the family had earned a reputation as conservative property managers in its 25 years of experience in the Jacksonville real estate market.[15]  The fact that SouthTrust required personal guarantees of the loans does not in itself indicate that the bank looked to Eli and Peter for repayment.  A SouthTrust official testified that the bank's general policy was to require personal guarantees on loans to closely held corporations.[16]

Appellants contend that, despite REE's and TNE's collateral and cash flow, SouthTrust could not have looked primarily to the corporations as a source of repayment because the properties' environmental contamination placed their income at some risk.  The contamination entitled Blockbuster to terminate the leases at any time, an event which would have cut off the corporations' income and deprived their collateral of much of its value.  In addition, because the Roosevelt property's contamination had spread to adjoining properties, TNE could have become liable for cleanup costs not covered by the EDI program.  Although the contamination did make REE's and TNE's futures slightly less secure, the mere presence of a risk did not require the tax court to find that SouthTrust could not have expected repayment from

---

[15]See SouthTrust Credit Offering Report, R-98-2872 Ex. 29-AC at 4.

[16]See Tr., R-98-2872-21 at 85 (testimony of Jerry Cutright).

the corporations. The Commissioner presented evidence that Blockbuster appeared unlikely to exercise its right to terminate[17] and that SouthTrust did not consider the environmental contamination to present a significant risk to its investment.[18] As the tax court pointed out, SouthTrust took steps to assure itself of the level of risk of termination: it "condition[ed] its loan commitments on its review of environmental audits of the land"[19] and "minimized its economic exposure to future environmental problems in the mortgage and security agreements."[20] REE's and TNE's chances of success likely would have appeared to SouthTrust to be much stronger than that of the S corporation in Selfe, which was a "thinly capitalized," "fledgling enterprise operated by a novice in a highly competitive field," Selfe, 778 F.2d at 775.

In Selfe, we stated that "arguments similar to [the taxpayer]'s—that the taxpayer's guarantee is in reality a loan made to the shareholder/taxpayer that is subsequently advanced to the corporation—usually meet with little success because

---

[17]For example, Blockbuster informed Peter that as long as one property was cleaned up in accordance with law and without substantial interference with the store's operations, "we hereby notify you that we would not exercise our termination rights under . . . the subject lease." Letter dated Oct. 2, 1992, from Shawn R. Ruben, Corporate Real Estate Counsel for Blockbuster, to Peter Sleiman, R-98-2873 Ex. 31-AE at 1.

[18]Although the independent appraisals of the properties mentioned the contamination, SouthTrust did not discuss the environmental problems in its internal credit reports.

[19]Mem. Op., R-98-2872-28 at 13.

[20]Id.

the taxpayer is unable to demonstrate that the substance of his transaction is different than its form." 778 F.2d at 774. Appellants have not presented one of the unusual sets of facts that would lead us to conclude that the substance of the SouthTrust loans did not equal their form. We agree with the tax court, therefore, that the Commissioner correctly refused to allow Eli and Peter to include the amounts of the guaranteed loans in their bases in REE and TNE.

## III. THE ALLOCATION OF BASIS

A taxpayer generally may deduct an allowance for depreciation of buildings, but not of land. See Keefer v. Commissioner, 63 T.C. 596, 599 (T.C. 1975). When a taxpayer purchases land with buildings on it, therefore, the amount of basis the taxpayer allocates to the buildings and land, respectively, may affect the taxpayer's total tax liability. The tax regulations require taxpayers to apportion basis in a property between land and buildings in a way that is proportionate to the relative value of the land and buildings.[21] ME's depreciable basis in the Shopping Center therefore depended on the relative fair market values of the Shopping Center's land and

---

[21]When a taxpayer purchases a combination of depreciable and nondepreciable property for a lump sum, as for example, buildings and land, the basis for depreciation cannot exceed an amount which bears the same proportion to the lump sum as the value of the depreciable property at the time of acquisition bears to the value of the entire property at that time.

26 C.F.R. §1.167(a)-5.

buildings at the time ME purchased them. When, as in this case, the Commissioner has determined an allocation of basis, a taxpayer bringing a deficiency proceeding bears the burden of proving by a preponderance of the evidence that the Commissioner's determination is erroneous. See Byram v. Commissioner, 555 F.2d 1234, 1236 (5th Cir. 1977).[22] "In making his case, the taxpayer must overcome a presumption of correctness which attaches both to the deficiency determination and to the facts which support it." Estate of Whitt v. Commissioner, 751 F.2d 1548, 1556 (11th Cir. 1985). See also Tax Ct. R. Practice 142(a).

Appellants claim that one piece of evidence proves that the Commissioner's reallocation was incorrect: the purchase and sale agreement dated July 31, 1991, which allocated $60,000 of the $745,000 purchase price to land.[23] The parties stipulated to two other pieces of evidence that bear on the value of the land. The first, an appraisal prepared by Hollis Wilson Crenshaw, Inc. (the "Hollis appraisal"), was dated as of October 1, 1991, nine months before ME purchased the Shopping Center.[24]

---

[22]Decisions by the former Fifth Circuit issued before October 1, 1981 are binding precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[23]See Purchase and Sale Agreement, R-98-2874 Ex. 6-F at 1. The closing statement, dated July 14, 1992, also allocated $60,000 of the purchase price to land. See Closing Statement, R-98-2874 Ex. 13-M at 3.

[24]See Appraisal Report, R-98-2874 Ex. 7-G.

18

It valued the land and buildings of the Shopping Center, ME's proposed renovations to the Shopping Center, and an adjoining office building and its land. The Hollis appraisal gave a total value of $2.8 million for land, buildings and renovations. It allocated $575,000 to land, including the adjoining office building's land.[25] The final piece of evidence regarding the value of the Shopping Center's land was a stipulation that the "Duval County property appraisers office appraised the value of the shopping center's land at $529,688.00 as of January 25, 1993," six months after ME purchased the Shopping Center.[26] The stipulation does not state whether the Duval County appraisal included the land of the adjoining office building.

The tax court concluded that the purchase and sale agreement did not overcome the presumption that the Commissioner's allocation of $377,735 to the land was correct. The court reasoned that the Hollis appraisal and the Duval County appraisal, which valued the land at $575,000 and $529,688, respectively, called into question the

---

[25]The parties did not show whether ME had purchased the adjoining office building and land. Even if ME did not purchase this building, the value of the land on which it stood is unlikely to explain the difference between the valuation of the land in the purchase and sale agreement and the valuation of the land in the Hollis appraisal, because the office building's site was a fraction of the size of the Shopping Center's site: the office building stood on 4,590 square feet of land, while the Shopping Center occupied 139,273 square feet.

[26]Stip. of Facts, R-98-2874-14 at 2-3, ¶ 9.

19

allocation of $60,000 stated in the purchase and sale agreement.[27] The tax court's determination of the allocation of basis is a finding of fact, which we review for clear error. See Coggin v. Commissioner, 71 F.3d 855, 860 (11th Cir. 1996); see also Bryant v. Commissioner, 790 F.2d 1463, 1465-66 (9th Cir. 1986).

Appellants argue that the purchase and sale agreement proved that the Commissioner's determination was erroneous. They contend that the best evidence of the fair market value of a piece of property is the price arrived at by the parties to a bargained-for, arm's length transaction. See, e.g., Vallejo Gen. Hosp. v. Bowen, 851 F.2d 229, 232 (9th Cir. 1988). Although the Commissioner concedes that the result of an arm's length price negotiation normally is conclusive proof of the total value of the property bargained for, it argues that the internal allocation of a total purchase price between the components of the property bargained for may not constitute proof of the components' relative values, because one party to the transaction may have no incentive to bargain for a particular allocation of the price.

---

[27]See Mem. Op., R-2872-28 at 17. The tax court found that the Hollis appraisal and the Duval County appraisal were not conclusive proof of the value of the land relative to the value of the buildings, because the Hollis appraisal included proposed renovations and the adjoining office building and land and the Duval County appraisal did not include the value of the buildings. The appraisals, although not conclusive proof of the land's value, served to call into question the purchase and sale agreement's allocation of values. See id. (stating that Hollis and Duval County appraisals showed that "the value of the land constitutes a greater percentage of the value of the entire property than the percentage allocated in the [purchase and sale] agreement").

We agree with the Commissioner's position on this issue. Although courts ordinarily will presume that a bargained-for total price has economic reality, a contract's internal allocation of price is not necessarily bargained for. The courts may disregard such an internal allocation if there is evidence that it may not reflect the true relative value of the components. For example, the court may find that the buyer's and seller's contractual allocation of values has "no basis in economic reality," Dixie Finance Co. v. United States, 474 F.2d 501, 504 (5th Cir. 1973), or that one party was indifferent to the allocation. In Blackstone Realty Co. v. Commissioner, 398 F.2d 991 (5th Cir. 1968), we rejected a seller's claimed allocation of basis between the sale of a leasehold and of leasehold improvements to a "buyer concerned only with the aggregate price," id. at 992. Blackstone quoted approvingly a Ninth Circuit case stating that

> The total purchase price was arrived at through arms length negotiation but the allocation of the selling price to the two pieces of property involved was not. Once the parties had agreed upon the purchase price it was a matter of indifference to the buyer as to how the seller allocated it. . . . [T]he federal income tax is a graduated tax and a given transaction may have different consequences depending upon the circumstances of the particular taxpayer.

Id. at 997 (quoting Particelli v. Commissioner, 212 F.2d 498, 500-01 (9th Cir. 1954)).

In the case before us, the Commissioner presented evidence—the Hollis and Duval County appraisals—that the contractual allocation of the purchase price

between the Shopping Center's land and buildings did not reflect economic reality. Although, as the tax court found, these appraisals could not prove definitively the relative value of the Shopping Center's components at the time of purchase, both of them placed a significantly higher value on the land than ME's claimed value of $60,000, and the Hollis appraisal found that the value of the land constituted a much larger proportion of the total value of the Shopping Center than the proportion assigned to the value of the land in the purchase and sale agreement. In light of this evidence that the purchase and sale agreement was unreliable evidence of the relative value of the land and buildings, the tax court did not err in finding that appellants had not overcome the presumption that the Commissioner's reallocation of their basis was correct.

## CONCLUSION

For the reasons stated above, we AFFIRM the decision of the tax court.